No. 89-76

IN THE SUPREME COURT OF THE STATE OF MONTANA

1990

LYNN G. SCHWEIGERT and GLENNA J.
SCHWEIGERT,

　　　　　　　Plaintiffs and Appellants,

　　-vs-

WILLIAM V. FOWLER and ROSEMARY T. FOWLER,

　　　　　　　Defendants and Respondents.

APPEAL FROM: District Court of the Ninth Judicial District,
　　　　　　　In and for the County of Toole
　　　　　　　The Honorable R. D. McPhillips, Judge presiding.

COUNSEL OF RECORD:

　　For Appellant:

　　　　Elizabeth A. Best; Best Law Offices, Great Falls,
　　　　Montana

　　For Respondent:

　　　　David F. Stufft; Frisbee, Moore, Stufft & Olson, Cut
　　　　Bank, Montana

Submitted on Briefs: Oct. 20, 1989

Decided: January 2, 1990

Filed:

Clerk

Justice Fred J. Weber delivered the Opinion of the Court.

This appeal arises from a judgment following a bench trial by the District Court, Ninth Judicial District, Toole County, Montana. Plaintiffs alleged fraud in the sale of land and sought rescission of a contract for deed. Following trial, the court found in favor of defendants. Plaintiff appeals. We affirm.

The controlling issues are:

1. Are the District Court's findings of fact supported by substantial credible evidence?

2. Did the District Court err in failing to order restitution for plaintiffs?

3. Did the District Court err in failing to require Defendants to pay Plaintiff's expert witness fees?

Lynn and Glenna Schweigert both grew up working on ranches. Lynn was raised in South Dakota and worked on various ranches from grade school through high school. Glenna was raised on a ranch in Montana. Lynn and Glenna met in Conrad, Montana while Lynn was working there as an ironworker. They married, and moved to various states while Lynn continued to do ironwork, eventually settling near Seattle, Washington. For approximately a year and a half in the mid-1960's, the Schweigerts moved back to Montana.

2

During this time they lived on the ranch owned by Glenna's father, helping him with ranching. They lived most of their married life in Washington, but desired to return to Montana to buy a ranch. Glenna's brother, Jack Hurley, is a rancher in Montana, and he began helping them search for a ranch to purchase.

In 1985 Mr. Hurley heard that a ranch very close to his ranch, owned by William Fowler, was for sale. On inquiry he learned that the asking price was $450,000, which he determined was too high. In 1986 Mr. Fowler called Mr. Hurley and informed him that he had lowered the price to $300,000. Mr. Hurley learned from a realtor that the ranch had been appraised at $250,000, and that Mr. Fowler might be willing to take even less. Mr. Hurley then discussed the Fowler ranch with his father, Gordon Hurley, and they determined that they should tell the Schweigerts about it. Gordon and Jack Hurley took a short tour of the ranch in the spring of 1986, driving through it in Gordon's pick-up. During this tour, Mr. Fowler showed them a gravel pit and pasture reservoirs.

In April of 1986 the Schweigerts decided to travel to Montana to view the ranch themselves. They arrived in Montana during a snowstorm. The next day they drove to the Fowler ranch but were unable to drive over the property because of the snow on the ground. However, they discussed the property with the Fowlers over the kitchen table.

A few days later Mr. Schweigert and Jack Hurley drove through the ranch, and on another occasion the Schweigerts were both driven through the property by Mr. Fowler. During this trip they asked Mr. Fowler about the presence of leafy spurge and knapweed. Mr. Fowler stopped and showed them a leafy spurge plant. Shortly after this, Lynn Schweigert and Jack and Gordon Hurley flew over the ranch to view its boundaries.

The Schweigerts decided to purchase the ranch, and the parties agreed to a price of $226,500. A Receipt and Agreement to Sell and Purchase was signed on April 17, 1986. This agreement did not state a total number of acres; rather the land was sold as a gross unit for a set price. Further, the agreement contained a clause which stated:

> Purchaser enters into this agreement with full reliance upon his independent investigation and judgment. No agreements, verbal or otherwise, modify or affect this agreement.

On April 18, 1986, the Schweigerts delivered $2,500 of earnest money to the Fowlers. They then moved from Washington to Montana. In April and June the Schweigerts seeded all of the spring crops for the 1986 growing season. After seeding the property, the Schweigerts executed a Contract for Pur-

4

chase and Sale on June 16, 1986. In this contract the total purchase price was stated as $221,500.

The Schweigerts continued to farm this property for the years 1986 and 1987. On August 7, 1987, they filed suit against the Fowlers, alleging fraud, and seeking rescission of the contract. On November 18, 1987, the Schweigerts were notified that they were in default under the terms of the contract. On December 22, 1987 they were notified that the contract for deed had been cancelled for failure to cure the default. On June 17, 1988, the Schweigerts executed a quit-claim deed on the property to the Fowlers.

I

Are the District Court's findings of fact supported by substantial credible evidence?

In reviewing the trial court's findings of fact and conclusions of law, this Court's standard of review is to determine whether the findings of fact are supported by substantial credible evidence. Lorenz v. Estate of Schilling (Mont. 1989), 768 P.2d 869, 870, 46 St.Rep. 198, 200. This Court will not overturn findings of fact by the District Court unless they are clearly erroneous. Rule 52(a) M.R.Civ.P.

In the present case, Plaintiffs are contending that Mr. Fowler made several fraudulent misrepresentations. They

contend that he made the following misrepresentations in order to induce them to buy the land:

a. The farm contained 750 acres of cropland, whereas it only contained 523 acres;

b. The farm contained 80-100 acres of irrigated producing hay land, whereas it only contained 35-40 acres of poorly producing hayfields;

c. Approximately 298 acres of farm ground leased from the State of Montana were broken and ready for production, whereas 59.3 acres of this land were unbroken;

d. Approximately 11 acres of crop land bordering the Fowler property and adjacent to land owned by neighbor, Merrill Kovatch, were contained in the State lease which was part of the Defendants' property, whereas these 11 acres were actually owned by Kovatch;

e. The property contained only approximately one acre of land which was infected with the noxious weeds leafy spurge and Russian knapweed, whereas 600 acres were heavily infested with noxious weeds;

f. A gravel pit located in Section 19 of the farm was contained in deeded acreage and was available for excavation as a source of needed income for a potential purchaser, whereas this gravel pit was actually owned by the Bureau of Land Management;

g. The barn water well located on the property would water 250 head of cattle and provide adequate water for the residence, whereas the barn well went dry watering only 48 head of cattle;

h. The reservoirs in the pasture land would hold water year round and provide adequate water for 120 - 150 animal units, whereas two pastures were incapable of holding water year round, and went dry;

i. That the pastures had a carrying capacity of 120 - 150 animal units, whreas they only had half this capacity;

6

j. No more than 50 posts would need replacement in order to repair fences adequately to hold cattle, whereas over 400 posts needed repair.

In Poulsen v. Treasure State Industries, Inc. (1981), 626 P.2d 822, 825, 38 St. Rep. 218, 221, we addressed allegations of fraud, stating:

> In Lee v. Stockmen's Nat. Bank (1922), 63 Mont. 262, 284, 207 P. 632, this Court set down the elements which a plaintiff must prove to make out a prima facie case of actual fraud: (1) a representation; (2) its falsity; (3) its materiality; (4) the speaker's knowledge of its falsity or ignorance of its truth; (5) his intent that it should be acted upon by the person and in the manner reasonably contemplated; (6) the hearer's ignorance of its falsity; (7) his reliance upon its truth; (8) his right to rely thereon; and (9) his consequent and proximate injury.
> Actual fraud is always a question of fact. Section 28-2-404, MCA. Fraud can never be presumed but must be proved by a preponderance of the evidence. Good faith will always be presumed and mere suspicion of fraud is not sufficient. (Citation omitted.)

Poulsen, 626 P.2d at 825.

Plaintiffs have alleged that Mr. Fowler made fraudulent misrepresentations about ten different conditions of the ranch property. They contend that these representations were material, that Mr. Fowler knew them to be false, yet induced the Schweigerts to purchase the property in reliance on the misrepresentations. Plaintiffs contend that they did not know the statements were false, that they relied upon these

7

misrepresentations, and that this reliance was justified. They contend they were damaged by the misrepresentations.

The District Court made lengthy findings of fact on the issue of fraud, specifically addressing most of the ten alleged misrepresentations. The court made no specific findings as to whether each of these representations were actually made by Mr. Fowler, or as to the falsity of each separate allegation. Rather, the District Court found that as to each alleged misrepresentation the Schweigerts learned the true condition of the property before they signed the contract to purchase on June 16, 1986. Thus the court concluded that the Schweigerts did not rely on the truth of the asserted false statements.

Initially, we note that the District Court found it significant that both Glenna and Lynn Schweigert had worked on ranches, and were familiar with farmland and farming methods. The court determined that the Schweigerts inspected the ranch property five times prior to signing any agreement. The court found it significant that Lynn Schweigert and Gordon and Jack Hurley flew over the property in an airplane to inspect the property. The Schweigerts seeded all of the spring crops for the 1986 growing season prior to signing the contract to purchase. The court noted that the property was open for inspection, prior to signing the intent to purchase and prior to signing the contract. Additionally, the court

emphasized that the Schweigerts never complained of any misrepresentations until filing suit in August of 1987, although they spoke with various people about the property, including Mr. Fowler and his son. The court noted that they seeded, harvested, marketed and appropriated for their own use two consecutive crops for 1986 and 1987, making no complaints.

In regard to the allegation that Mr. Fowler said the property contained 750 acres of cropland, whereas the ranch only contained 523 acres of cropland, the District Court found several facts to be relevant. On April 17, 1986, Mr. Schweigert told the Agricultural Stabilization and Conservation Service (ASCS) office in Toole County that he would be seeding a total of 235.3 acres during 1986. The court noted that the Schweigerts were aware that only one-half of the farmland would be cropped on any given year. On July 28, 1986 Mr. Schweigert purchased hail insurance, representing that his total number of acres for the crop year 1986 was 235.7 acres. On December 9, 1986 Mr. Schweigert contracted to participate in the 1987 federal government price support and production price support programs. He acknowledged that he was to seed 129.4 acres of wheat and 103.8 acres of crop lands. He did not at that time complain about the number of farm acres. On November 24, 1986 the ASCS office informed the Schweigerts that their cropland acres were 595.9 acres.

The court also noted that ASCS maps are available from which a producer can determine how many acres he has seeded.

In regard to the alleged misrepresentation by Mr. Fowler that the ranch contained 80 to 100 acres of irrigated, producing hayland, the court found that the Schweigerts were shown the hay land and knew that the hay land needed to be reseeded during their own visual inspection of the properties in April 1986.

The Schweigerts place much emphasis on their allegation that the property was "infested with noxious weeds." The court, however, found that Lynn Schweigert knew there was knapweed infestation during the 1986 spring seeding. Jack Hurley testified that he discussed the knapweed with Lynn that spring, and Mr. Schweigert admitted that he sprayed for knapweed on forty acres of the property prior to signing the purchase agreement. Additionally, the Toole County weed supervisor testified that knapweed and leafy spurge are observable at all times during the year.

In regard to the leafy spurge, the court found that John Wanken, a rancher in the area, testified that he saw leafy spurge in full bloom on the property in May 1986, on the day of an auction that was conducted to sell Mr. Fowler's farm machinery. The court noted that Glenna Schweigert testified that she conversed with federal agencies regarding the con-

trol and containment of leafy spurge and knapweed during the summer of 1986.

The Schweigerts contend that Mr. Fowler represented that he owned the gravel pit, when in fact it was located on Bureau of Land Management (BLM) properties. The court, however, found that Mr. Fowler told the Schweigerts that he did not know who owned the gravel pit. The court additionally noted that Glenna Schweigert made extensive notes of meetings with Mr. Fowler in April 1986, yet those notes contained no mention of the gravel pit. In September 1986, the Schweigerts received a map showing the location of all BLM properties on the ranch. Mr. Tom Stokes, an excavator, testified that in September 1986 Lynn Schweigert showed him the BLM map and told him he believed the gravel pit was on BLM land. The Schweigerts, however, made no complaints at this time about the gravel pit.

As to the Schweigert's complaints about the reservoirs, the court observed that the reservoirs were open and could be readily inspected prior to the signing of the contract. It also noted that some years are "dry", and there will be no water for the reservoirs. The court found that the water well did not go dry.

At trial the Schweigerts admitted that the issue of how many fence posts needed repair was a minor concern. The court determined that, in any event, the number of fence

11

posts to be replaced was open, obvious and could be readily seen by the Schweigerts during their first inspections of the property.

From our review of the record, we conclude that substantial credible evidence supports the findings of fact by the District Court. The Schweigerts had extensive background in farming and ranching prior to marriage. While married they spent 1½ to 2 years working on a ranch owned by Glenna's father, which is only a few miles from the ranch they purchased. On their first trip to Montana in April 1986, they spent ten days to two weeks at the home of Glenna's brother, Jack Hurley. During this time they inspected the property numerous times. Glenna's father and brother were experienced ranchers in that area. They signed an agreement to purchase which contained a clause stating that they were relying on their independent inspection of the property. They physically worked the property for two months prior to signing the final contract for deed on June 16, 1986. During this time they had continuous opportunity to discover the true conditions of the ranch property. The Schweigerts inspected, seeded, and worked the property prior to signing the contract to purchase. Even in the absence of their admitting that they knew the true condition of the property, it is clear from the court's findings that the Schweigerts did not rely on the truth of the alleged false statements. Substantial

credible evidence supports this conclusion, and the District Court's conclusion that the Schweigerts failed to prove the elements of fraud by a preponderance of the evidence.

The District Court also made extensive findings relating to the fact that the Schweigerts did not complain of any fraud or misrepresentation until late in 1987, and in fact treated and referred to the property as their own, before and even subsequent to filing suit in August 1987. Section 28-2-1713, MCA, states that to accomplish rescission a party must "rescind promptly upon discovering the facts which entitle him to rescind. . .," and must restore or offer to restore the property which was received under the contract. The District Court noted that the Schweigerts admitted that they were aware of all alleged misrepresentations by spring of 1987, yet continued to work the property and appropriate the crop for their own use. The Schweigerts neither informed the Fowlers of the alleged fraud, nor offered to tender the property back. As late as October 1987 the Schweigerts were treating the property as their own and representing to third parties that they owned the property. We conclude that these findings by the District Court are supported by substantial credible evidence, and were properly considered by the District Court in analyzing the fraud issue. We affirm the District Court's conclusion that fraud was not proven.

13

Plaintiffs allege that the District Court erred in trying this solely as a case for rescission, which foreclosed any attempt to prove damages for fraud. We conclude that it is unnecessary to discuss this issue since plaintiffs failed to prove fraud.

II

Did the District Court err in failing to order restitution for plaintiffs?

The Schweigerts contend the District Court should have ordered Fowlers to pay restitution to them of approximately $110,000. This amount includes Schweigerts' down payment of $40,000, improvements to the property valued at $80,000, and payments on certain loans. The Fowlers sold the property prior to trial for $241,000. The Schweigerts contend it is "unfair" to allow Fowlers to benefit from selling the land twice. Plaintiffs urge several theories to support this contention.

Plaintiffs contend that § 71-3-1302, MCA, allows them a purchaser's lien against the property. That statute provides:

> Purchaser's lien on real property. One who pays to the owner any part of the price of real property, under an agreement for the sale thereof, has a special lien upon the property, independent of possession, for such part of the amount paid as he may be entitled to recover back, in case of a failure of consideration.

14

This statute is not helpful to the Schweigerts. It only applies to a case where there is a failure of consideration and the purchaser is entitled to recover part of the amount paid. In the present case, the District Court did not grant rescission; hence, there was no failure of consideration. cf. Warner v. Peterson (1988), 762 P.2d 872, 45 St.Rep. 1939 (allowing a purchaser's lien where rescission was granted).

Plaintiffs urge application of Montana's anti-forfeiture statute, § 28-1-104, MCA, which states:

> Relief from forfeiture. Whenever by the terms of an obligation a party thereto incurs a forfeiture or a loss in the nature of a forfeiture by reason of his failure to comply with its provisions, he may be relieved therefrom upon making full compensation to the other party, except in case of a grossly negligent, willful, or fraudulent breach of duty.

However, this statute is also not helpful to Schweigerts. They did not offer to pay Fowlers full consideration for the property.

Finally, Schweigerts contend that restitution is appropriate because Fowlers have been unjustly enriched, citing Robertus v. Candee (1983), 205 Mont. 403, 670 P.2d 540. This allegation ignores the fact that Schweigerts are the defaulting purchasers, and the contract for deed expressly stated that in the event of purchaser's default, all payments made and any improvements to the property would be retained by the sellers. Restitution is normally denied to a defaulting

15

purchaser. Burnham, Contract Damages in Montana Part II: Reliance and Restitution, 45 Mont.L.Rev. 1, 19 (1984). This view was implicitly acknowledged in Robertus, where the non-breaching injured party was allowed restitution from the party that breached or repudiated an oral contract.

Additionally "[u]njust enrichment is an equitable doctrine wherein the plaintiff must show some element of misconduct or fault on the part of defendant, or that the defendant somehow took advantage of the plaintiff." Randolph V. Peterson v. J.R. Simplot Co. (Mont. 1989), 778 P.2d 879, 883, 46 St. Rep. 1463, 1468; Brown v. Thornton (1967), 150 Mont. 150, 156, 432 P.2d 386, 390. While this standard may state an "overly restrictive view of the availability of restitution," Burnham, at 12, it is appropriate in the present case. The Schweigerts failed to establish misconduct on the part of Fowlers, and the equities of the present case do not support a theory of unjust enrichment.

We conclude that Schweigerts have failed to present any basis for restitution.

### III

Did the District Court err in failing to require Defendants to pay Plaintiff's expert witness fees?

The Schweigerts contend that the District Court erred in failing to require the Fowlers to pay $293.50 in fees in-

16

curred when Fowlers deposed two of Schweigerts' expert witnesses.

In October 1987, counsel for Fowlers requested through interrogatories the names and addresses of all expert witnesses to be called by the Schweigerts at trial. This request included summaries of the experts' testimony. The Schweigerts, however, did not produce names of any experts until July 7, 1988, at which time they produced names of seven expert witnesses, but no addresses or summaries of testimony. Counsel for Fowlers then moved the court for a protective order, or in the alternative, a continuance of the trial, since trial was set for July 26, 1988. However, the parties agreed that certain expert witnesses would be deposed prior to trial, and the court did not rule on the motion.

Counsel for Fowlers deposed two expert witnesses in July of 1988. In a posttrial motion to alter or amend the judgment, the Schweigerts raised the issue of whether Fowlers should be required to pay fees associated with these depositions. That motion was denied by the District Court. On appeal, the Schweigerts contend that the District Court should have required the Fowlers to pay these fees, citing Rule 26 (b)(4)(C), M.R.Civ.P. Our analysis of this rule, however, discloses no error. The rule does not require the court to order payment of expert witness deposition fees, unless the court has ordered this discovery, and even in that

instance, the court may not order payment if manifest injustice would result. We conclude that the District Court did not err in failing to require Fowlers to pay expert witness fees.

Affirmed.

_____
Justice

We Concur:

_____
Chief Justice

_____

_____

_____
Justices

18