Kimberly McCLELLAND, Appellant,

v.

Larry OZENBERGER, M.D.,
Respondent.

No. WD 43161.

Missouri Court of Appeals,
Western District.

Jan. 22, 1991.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 5, 1991.

Application to Transfer Denied
April 9, 1991.

Arthur H. Stoup, Stephen W. Nichols, Kansas City, for appellant.

Michaela M. Warden, Nancy M. Landis, Overland Park, Kan., for respondent.

Before LOWENSTEIN, P.J., and SHANGLER and MANFORD, JJ.

LOWENSTEIN, Judge.

Appellant Kimberly McClelland (Kim) appeals from a jury verdict in favor of defendant-respondent Dr. Larry Ozenberger relieving him of liability for damages in this medical malpractice action.

Ozenberger is a family practitioner who attended Kim during her pregnancy and delivery. On December 25, 1986, Kim delivered her baby at Spelman Hospital in Smithville. Dr. Ozenberger, assisting with the delivery, performed a left mediolateral episiotomy. In this procedure, Dr. Ozenberger cut Kim's genital area to prevent adjacent tears in the birth canal when the baby's head emerged. Shortly after leaving the hospital December 28, 1986, Kim noticed she would occasionally have loose stool and drainage from her vagina. Kim never told Dr. Ozenberger about this problem, even though she saw him at her six-week check-up. It was not until she filed suit did he learn of her problem.

Kim saw George Saleh, D.O., on August 6, 1987, a physician specializing in obstetrics and gynecology. Dr. Saleh diagnosed Kim's problem as a recto-vaginal fistula, a canal connecting the rectum to the vagina. Dr. Saleh referred Kim to Dr. John Campbell, M.D., a colon/rectal surgeon.

Dr. Campbell examined Kim on August 13, 1987, and confirmed Saleh's diagnosis. On August 21, 1987, Dr. Campbell surgically removed the fistula. His post-operative diagnosis was recto-vaginal fistula, plus possible anal cryptitis and incomplete development of the anal canal with mucosal prolapse.

Plaintiff's counsel first spoke to Dr. Campbell on April 13, 1988, and then filed suit on May 3, 1988. On May 9, 1988, plaintiff's counsel asked Dr. Campbell for his opinion regarding Kim's fistula problem. Dr. Campbell responded by letter on May 23, 1988, saying "since there was (sic) apparently no muscles involved in this extension, the episiotomy evidently cut into the rectal wall and was not repaired. I think that to have a complication like this would not be unusual, but to do nothing about it is strictly poor medical practice."

The full text of the letter is contained in the footnote.[1]

On July 27, 1988, Kim executed an authorization to Dr. Campbell. This authorization allowed him to release medical records to defense counsel but specifically disallowed discussions between Dr. Campbell and defense counsel. On January 6, 1989, defense counsel approached Dr. Campbell, who discussed Kim's case despite the authorization's prohibition of discussions. On May 25, 1989, defense counsel filed a motion to compel Kim to sign a medical authorization allowing not only examination of records, but also private discussions with Dr. Campbell. The following day, *before* the motion was ruled upon, defense counsel *again* spoke to Dr. Campbell about Kim's case. On June 26, 1989, *after* the *ex parte* discussions occurred, plaintiff's counsel designated Dr. Campbell as an expert witness expected to be called at trial. Defense counsel's motion to compel authorization was heard July 7, 1989. The record on this motion is unclear; it was either overruled or not ruled upon at all. Dr. Campbell was deposed October 10, 1989. Because he was absent at trial, his deposition was admitted on behalf of the defendant Dr. Ozenberger.

Kim's theory of the case was that Dr. Ozenberger either negligently cut into the roof of Kim's rectum or failed to recognize and treat the fistula at her six-week post-delivery check-up. Dr. Ozenberger's defense rested on the theory that there are a number of possible causes for Kim's recto-vaginal fistula, such as cryptitis, necrosis, or mucosal prolapse.[2]

As her main point of error, the plaintiff alleges the court erred in overruling her motion to suppress the deposition of Dr. Campbell or, in the alternative, her motion in limine filed one week before trial, in that Dr. Campbell, Kim's treating physician, was incompetent to testify as a witness because he violated the physician-patient relationship set forth in § 491.060(5), RSMo (1986) when he participated in two pre-trial, *ex parte*, conversations with defense counsel without Kim's authorization or court order. Point II adds that the trial court erred in admitting the deposition because Dr. Campbell breached fiduciary duties to Kim. These points are consolidated.

Kim contends Dr. Campbell's opinion of her episiotomy complication changed after the *ex parte* discussions with defense counsel. Specifically, Kim argues that Dr. Campbell retreated from his earlier position as stated in his May letter that Dr. Ozenberger's treatment "constituted poor medical practice," *supra*, footnote 1. Dr. Campbell's office records note the January 6, 1989, visit with defense counsel and state: "Discussion on Kimberly: Told that epi was not a malpractice thing but probably skimmed over the crypts and glands which then resulted in the abscess & fistula." Defense counsel responds that Dr. Campbell's notes following the January 6 meeting and Dr. Campbell's October 10 deposition testimony do not reflect a change in his characterization of Kim's case. Rather, defense counsel contends that the phrase "skimming over crypts" is merely another way to express the phrase

---

**1.** Dear Mr. Stoup;

Kimberly McClelland was seen on August 13, 1987 with chief complaint if (sic) stool in the vagina. Her history was that she had a vaginal delivery on December 25, 1986 and at that time having a fourth degree midline laceration. She apparently has had this problem since, and as far as I know, little attempt was made by her doctor to repair this or refer her for repair. She subsequently transferred her care to Dr. Salah, (sic) who is an Obstetrical Gynecologist in North Kansas City, and he referred her to me.

Her examination showed a posterior lateral episiotomy which was well healed in the perianal and perineal portion, however, at it's (sic) upper extent there was communication between the rectum and the vagina. Since there was (sic) apparently no muscles involved in this extension, the episiotomy evidently cut into the rectal wall and was not repaired.

I think that to have a complication like this would not be unusual, but to do nothing about it is strictly poor medical practice.

Sincerely yours,

Dr. Campbell

/s/

**2.** These conditions are the inflammation of anal crypts, death to tissues from prolonged pressure of the baby's head deep in the pelvic region, and the collapse of rectal mucous membranes, respectively.

"a tiny cut or entry into the crypt." Furthermore, defense counsel maintains that Dr. Campbell used "abscess" to describe the natural history of anal cryptitis as a cause of recto-vaginal fistula. From the record, this court is unable to ascertain how much Dr. Campbell's position changed, if at all. Dr. Campbell testified at deposition that a recto-vaginal fistula is not an unusual episiotomy complication. He further stated, however, that if it does develop, then a doctor's failure to treat falls below accepted standards of medical practice. It is conceded the fistula developed just after the episiotomy.

Because the discussions between defense counsel and Dr. Campbell were *ex parte*, on appeal there is no record of their contents. Defense counsel claims they merely told Dr. Campbell that Kim failed to tell Dr. Ozenberger of her problem. Thus, they apparently wanted to ensure that Dr. Campbell's opinion took this alleged fact into account because they claim plaintiff's counsel, when initially discussing Kim's problem with Dr. Campbell, did not tell him that Kim never told Dr. Ozenberger about her problem.

■ The first real question in this case is unanswered in the law: Does an unauthorized *ex parte* conversation between defense counsel and the plaintiff's treating physician in a medical negligence case *ipso facto* render the physician incompetent to testify at trial? The answer to this issue depends on whether the physician changed his theory of diagnosis or opinion as a consequence of the *ex parte* conversations. If these threshold issues reveal a wrong done to the plaintiff, then the difficult task of creating a remedy remains. If the physician's testimony is deemed incompetent then the jury is precluded from hearing relevant testimony that could reveal the truth.

■ Section 491.060(5), RSMo 1986 provides that a physician shall be incompetent to testify "... concerning any information which he may have acquired from any patient while attending him in a professional character, and which information was necessary to enable him to prescribe and provide treatment for such patient ...." The privilege belongs to the patient and only he may waive it. *St. Louis Little Rock Hosp. Inc. v. Gaertner*, 682 S.W.2d 146, 151 (Mo.App.1984). A patient waives this privilege once he places his physical condition in issue under the pleadings, "so far as information from doctors or medical and hospital records bearing on that issue is concerned." *State ex rel. McNutt v. Keet*, 432 S.W.2d 597, 601 (Mo. banc 1968) (footnote omitted). In *McNutt*, defendant-relators sought a writ of mandamus to compel production of plaintiff's medical and hospital records. The court specifically held that "once the matter of plaintiff's physical condition is in issue under the pleadings, plaintiff will be considered to have waived the privilege under § 491.060(5) so far as information from doctors or medical and hospital records bearing on that issue are concerned." Kim's petition alleged two theories that Dr. Ozenberger "negligently and carelessly caused and permitted a large recto-vaginal fistula to occur ...," and that he also "negligently and carelessly failed to repair the negligently placed episiotomy incision." Dr. Ozenberger denied these allegations in his answer. Thus, Kim's physical condition became an issue, and her physician-patient privilege was waived. Kim's waiver, however, was merely partial because it does not "automatically extend[s] to every doctor or hospital record a party has had from birth regardless of the bearing or lack of bearing, as may be, on the matters in issue." *McNutt v. Keet, supra*, 432 S.W.2d at 602. Protective orders may be used to limit production of records to those which reasonably relate to the plaintiff's alleged injuries. *Id.*

The Missouri Rules did not explicitly allow or prohibit *ex parte* conversations with a plaintiff's physician. In this case, though, Dr. Campbell was not certified as an expert witness until after both *ex parte* conversations occurred. Both parties concede, though, that *State ex rel. Stufflebam v. Appelquist*, 694 S.W.2d 882 (Mo.App. 1985), was the controlling law when the *ex parte* conversations occurred. *Stufflebam*

has since been overruled by *State ex rel. Woytus v. Ryan*, 776 S.W.2d 389 (Mo.banc 1989).

Kim's points of error regarding the *ex parte* conversations raise the following issues: (1) whether *State ex rel. Stufflebam v. Appelquist*, 694 S.W.2d 882 (Mo.App. 1985), was the applicable law at the time of the *ex parte* discussions; (2) whether *Stufflebam v. Appelquist* allowed *ex parte* discussions between defense counsel and Dr. Campbell, the physician who repaired Kim's fistula and (3) what remedy, if any, is appropriate if the *ex parte* discussions were improper.

The *Stufflebam* court held that defense counsel in a medical malpractice action was entitled to obtain, by court order, an authorization from the plaintiff permitting defense counsel to interview privately the plaintiff's treating physician. *Stufflebam*, 694 S.W.2d at 883–84. Defense counsel here argues that *Stufflebam* does not instruct a plaintiff's treating physician to get a written medical authorization allowing *ex parte* conversations with defendant's attorneys before he may consent to such conversations. Kim counters that *Stufflebam* does not allow *ex parte* conversations until defense counsel files a motion with the court to compel the plaintiff to execute an authorization allowing private discussions, assuming plaintiff does not voluntarily execute an authorization.

This court agrees with plaintiff. Even though *Stufflebam* did not hold that *ex parte* discussions were improper *per se*, the court allowed defense counsel to obtain a court order to compel plaintiff to execute an authorization allowing for ex parte discussions. The *Stufflebam* court noted that even though a motion to compel the plaintiff to execute an authorization allowing *ex parte* discussions may be granted, the trial court has no authority to compel the treating physician to speak to defense counsel.

■ *Stufflebam's* holding necessarily implied defense counsel must file a motion to compel when plaintiffs resist giving authorizations for *ex parte* discussions. Otherwise, the court would have stated the motion to compel was unnecessary. Dr.

Ozenberger's counsel actually filed a motion to compel. Even though they filed it after the *ex parte* discussions occurred, this act undercuts defense counsel's argument that filing such motions were not necessary. This court finds *Stufflebam* did not authorize *ex parte* discussions with Dr. Campbell without the grant of a motion to compel a medical authorization allowing for such discussions.

In *Woytus*, the plaintiff instituted a proceeding in prohibition to prevent the trial court from issuing an order compelling plaintiff to execute a medical authorization allowing defense counsel in suit for personal injuries to have *ex parte* discussions with plaintiff's treating physician. At page 302 the Court noted Rule 56.01 and Rule 41.04 "do not expressly forbid *ex parte* discussion, neither do the Rules expressly authorize such discussion as a method of discovery." On the same page the court pointed out the legislative expression of a privileged relationship in § 491.060 is to enable the patient to get "complete and appropriate treatment by encouraging candid communication" free from the later possibility of invasion of privacy resulting from an unauthorized disclosure. The *Woytus* court weighed the defendant's right to know under the waiver espoused in *McNutt*, against plaintiff's right to a confidential relationship with his physician. The court said *"ex parte* discussion creates an opportunity for the consideration of extrinsic matters that may subtly compromise a physician's duty of loyalty ..." *Id.* at 395. The Supreme Court made the writ permanent, holding that defendants were not entitled to obtain by court order such a medical authorization. It reasoned that "[A]ny burdens caused defendants by being restricted to the specially enumerated discovery procedures are outweighed by the potential risks to the physician-patient relationship in deviating from these procedures." *State ex rel. Woytus*, 776 S.W.2d at 395. The law declared in *Woytus*, though not controlling as to the actions in the case at bar, shows a judicial philosophy that discourages these sorts of discussions with plaintiff's doctor. The remaining

points will now be addressed before effect is given to the first point.

Kim's next point on appeal is an offshoot of the controversy surrounding Dr. Campbell's role as an expert in the case. Kim argues the trial court erred in admitting into evidence, on behalf of the defendant, portions of Dr. Campbell's deposition because there was lack of a proper foundation in that the requirements of Rule 57.-07(a)(3) were not met. As pertinent here Rule 57.07(a)(3)(C) allows the deposition of any witness, not present, to be "used by any party for any purpose if the court finds ... the witness is a ... physician and engaged in the discharge of his official or professional duty at the time of trial." *Id.* Under 57.07(b), the facts authorizing use of the deposition may be established "by any competent evidence."

Counsel for Dr. Ozenberger told the court Campbell had been subpoenaed the day of trial but he was "engaged in the medical practice of his profession." Ozenberger then produced a typed note written on Dr. Campbell's letterhead and signed by him stating he would be engaged in the discharge of his professional duties that week. At the bottom of the page Janice Keeton, a notary holding a valid commission, noted that Campbell had "appeared before me and applied his signature."

■ The plaintiff correctly states the burden was on the party offering the deposition to prove admissibility. *Tillman v. Wedge Mobile Service Station,* 565 S.W.2d 653, 656 (Mo.App.1978). The defendant counters by saying the deposition was properly allowed under part (G) of Rule 57.07(a)(3), which allows the deposition to be admitted when: "the witness is absent without the consent, connivance or collusion of the party and the party in the exercise of due diligence has been unable to procure the attendance of the witness by subpoena." In *Null v. Gray,* 534 S.W.2d 823, 825 (Mo.App.1976), the court said: "the finding as to inability of a witness to attend court rests largely within the discretion of the trial judge."

■ Despite a meager record and no specific ruling on the point, this court cannot say it was an abuse of discretion to allow the defendant to introduce the deposition under part (G), particularly in light of the plaintiff having been allowed to introduce into evidence Dr. Campbell's letter of May 23.

■ Kim's next point stems from the trial court refusing to admit into evidence Spelman Hospital's By–Laws, Rules and Regulations. These rules required doctors to note operative procedures in the patient case records. These policies were offered to "cast doubt upon the credibility of Defendant's case" because Dr. Ozenberger did not document the episiotomy. The exhibit was not offered to show a causal connection between failure to follow the rules regarding preparation of medical records and any damage sustained by plaintiff.

This court cannot say the trial court abused its discretion in deciding not to receive evidence of a collateral matter. *Lineberry v. Shull,* 695 S.W.2d 132, 137 (Mo. App.1985). Even if the ruling was incorrect, Kim has not demonstrated prejudice, *Gordon v. St. Mary's Hospital,* 769 S.W.2d 151, 155–56 (Mo.App.1989), so a reversal would not be in order. Rule 84.13(b). Plaintiff's related fifth point on appeal concerns being prevented from pursuing this matter with her expert witness. This point is presented without aid of case authority and is also denied.

■ The next point on appeal concerns defense counsel's closing argument. Kim argues the trial court erred in allowing, over objection, counsel to tell the jury contents of conversations Dr. Ozenberger and his counsel, specifically the doctor's comment that "he had a good jury." Kim argues that such a closing argument constituted a blatant appeal to the jury's emotion and passion and prejudiced her. The trial court was in a better position to appraise the consequence of the closing argument, and this court will intervene only if the trial court has abused its discretion. *Titsworth v. Powell,* 776 S.W.2d 416, 421 (Mo.App.1989). The point is denied.

■ Kim's last point requires a first-time interpretation of Rule 56.01(b)(4)(b) to determine whether a defendant is required to pay the reasonable fee of a supplemental deposition of plaintiff's expert, which was ordered because plaintiff's counsel instructed the expert not to answer questions which were later deemed proper. The Rule reads:

(b) A party may discover by deposition the facts and opinions to which the expert is expected to testify. Unless manifest injustice would result, the court shall require that the party seeking discovery pay the expert a reasonable fee for responding to discovery by deposition.

The defendant deposed Kim's expert, Dr. Janes, and paid his fee. On advice of plaintiff's counsel, Dr. Janes declined to answer a number of questions in the deposition. On defendant's motion, the trial judge ordered the doctor to answer the questions in a second deposition. Kim later asked that Dr. Ozenberger pay Dr. Janes' additional $300 fee, arguing that the defendant would have had to pay for the time if the questions had been answered in deposition number one.

Although not addressing the same aspect of the Rule, the language in *George v. Eaton*, 789 S.W.2d 56, 62 (Mo.App.1990), about preparation time applies to this situation:

It should be noted, however, that not every case will compel the payment of expert preparation time. Factors the trial court should consider include the complexity of the case, the proximity of the deposition and trial dates, delays in the discovery process, and any other "com-

pelling circumstances" the court deems important.

Similarly, the Supreme Court of Montana refused to require a defendant to pay some $293.50 in expert fees for deposition time where the plaintiff was dilatory in discovery by not providing summaries or promptly supplying names or producing the witnesses. *Schwiegert v. Fowler*, 240 Mont. 424, 784 P.2d 405, 411–12 (1990). This point is denied.

All points except those relating to the *ex parte* conversations are denied, and the trial court is affirmed as to them. Defense counsel's *ex parte* discussions with Dr. Campbell, however, were improper. Kim suggests that a new trial and the exclusion of Dr. Campbell's testimony would be a proper remedy. This court elects to create another remedy for this unique problem.

■ The issue of *ex parte* contacts will be remanded for an evidentiary hearing.[3] If the trial court determines prejudice to the plaintiff, it shall grant a new trial. The burden to prove no prejudice at this hearing shall be on the defendant. If it grants a new trial, then the trial court must determine whether Dr. Campbell's testimony may be presented by the defendant. If the trial court finds the *ex parte* discussions involved counsel presenting facts to Campbell that would have eventually been posed to him under oath, it then shall determine an absence of prejudice and the judgment on the verdict will be allowed to stand. The order prohibiting or granting a new trial shall be subject to appeal by either aggrieved party. This court will grant an expedited appeal process pursuant to motion filed under this Court's Special Rule II. All of appellant's other points are denied. The matter of defendant's *ex parte* con-

---

**3.** This result does no violence to the law of evidence prohibiting the application of the exclusionary rule to civil cases. In civil cases the state is not concerned with the "method by which a party has secured the evidence which he adduces in support of his contention; and hence, in the absence of constitutional or statutory restrictions, evidence which is otherwise admissible will not be excluded because it has been obtained fraudulently, wrongfully, or illegally." *Diener v. Mid–American Coaches, Inc.*, 378 S.W.2d 509, 511 (Mo.1964). *See also In Re*

*Littleton*, 719 S.W.2d 772, 775 (Mo. banc 1986); *Bogart v. Jack*, 727 S.W.2d 447, 448 (Mo.App. 1987).

*Diener, supra,* does not apply here because the case at bar does not involve the admission of improperly obtained evidence in a civil suit. Rather, it involves the propriety of private visits between defense counsel and his opponent's most important witness, plaintiff's treating physician, to discuss the physician's theory of the case.

tacts with defense counsel is remanded for an evidentiary hearing as outlined in this opinion. Costs are to be equally divided.