**Nicole ADAMS, a minor by next Friend B. RIDGELL, Respondent–Appellant,**

v.

**The CHILDREN'S MERCY HOSPITAL, et al., Appellant–Respondent,**

and

**Jane Jelinek, M.D., Respondent.**

**No. WD 44857.**

Missouri Court of Appeals, Western District.

Feb. 23, 1993.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 30, 1993.

536

Timothy M. Aylward, Sally L. Thieman and Cynthia L. Dillard, Blackwell, Sanders, Matheny, Weary and Lombardi, Kansas City, for appellant-respondent Children's Mercy Hosp.

Reid Holbrook and Janet Simpson, Holbrook & Heaven, P.A., Kansas City, KS, for respondent Jane Jelinek, M.D.

Gary C. Robb and Anita P. Robb, Robb and Robb, Kansas City, for respondent-appellant Adams.

Before ULRICH, P.J., and SPINDEN and SMART, JJ.

SMART, Judge.

This medical malpractice action includes a claim of hospital negligence in failing to provide adequate advance notice of surgery assignments to anaesthesia residents. It also involves claims of vicarious liability for the actions of doctors and residents performing surgery at the hospital, claims of instructional error, and evidentiary questions. The plaintiffs and Children's Mercy Hospital both appeal from the judgment awarding Nicole Adams $3,082,518.16 in economic and non-economic damages, and awarding Julia Adams, Nicole's mother, $95,000.00 in non-economic damages.[1]

This action was brought on behalf of Nicole Adams, who was eight years old at the time of her injury, by her mother, Julia Adams. On March 25, 1988, Ms. Adams was cooking when Nicole accidentally hit the handle of one of the skillets, which spun off the stove, spilling hot grease on her. Ms. Adams took her daughter to Children's Mercy Hospital where she was instructed that her daughter would need skin grafting surgery for her burns. Surgery was scheduled for March 30, 1988. Nicole's skin grafting surgery was to be relatively routine and her burns were not major.

Dr. Ronald Sharp performed the skin grafting surgery on Nicole. During Nicole's surgery she received 7,000 cubic centimeters of crystalloid (a diluted salt water solution) from Dr. Jane Jelinek,[2] who was on rotation to Children's Mercy Hospital to fulfill her residency requirements at the University of Kansas. Dr. Jelinek was supervised during a portion of the procedure by Dr. Robert Binda,. and during another portion by Dr. Peter Mestad. For part of the procedure, neither Dr. Mestad nor Dr. Binda was present to lend supervision. It is undisputed that 7,000 cc's of crystalloid was in excess of the appropriate amount, causing substantial swelling of bodily tissue. Following the surgery, Dr. Mestad removed Nicole's breathing tube. About six minutes after the extubation, Nicole suffered cardiopulmonary arrest as a result of closure of her airway, due to swelling. When Dr. Mestad finally re-intubated Nicole, the tube was improperly placed, resulting in only one lung being ventilated. This series of events had tragic and irreversible consequences. Nicole is now severely brain damaged, blind, and neurologically impaired. After trial, the jury returned a verdict in favor of plaintiffs. The jury allocated 20% of the fault to the hospital; 18% to Dr. Jelinek; 2% to Dr. Sharp (the surgeon); and 50% and 10% respectively to Drs. Mestad and Binda, supervising anesthetists. After judgment was entered on the jury verdict, plaintiffs and the hospital both appealed, claiming trial court error. The Missouri Supreme Court resolved plaintiffs' constitutional challenges to portions of Chapter 538 RSMo, upholding the statutory scheme, including the non-economic damage caps, and transferred the case to this court for resolution of the remaining issues. *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 '(Mo. banc 1992). This court will first address the points raised by the plaintiffs, and then the points raised by the hospital on appeal.

### Amendment of Pleadings

Plaintiffs contend in their first point before this court that the trial court erred by

---

1. The jury's verdict in the case, in the absence of the application of the provisions of Chapter 538, RSMo 1986, would have been over twenty million dollars. *Adams v. Children's Mercy Hosp.*, 832 S.W.2d 898 (Mo. banc 1992). The verdict would have been reduced to approximately fourteen million dollars by pre-trial settlements and other credits. The application of Chapter 538 brought the net judgment in this case down to approximately $3.2 million. Certain physicians and nurses settled with plaintiffs prior to trial. The settlements were in a total amount of approximately $5.5 million. The jury verdict was against the hospital (20% of the fault) and

Dr. Jelinek–Boozalis (18% of the fault). The balance of the fault (62%) was allocated to defendants who had already settled: Sharp, Binda and Mestad. Section 538.230 permits allocation of fault to settling parties in medical negligence cases.

2. Dr. Jelinek's name has since changed to Jelinek–Boozalis as a result of her marriage. For convenience, we shall refer to her as "Dr. Jelinek." Dr. Jelinek is not an appellant in this case.

admitting defendant's evidence of the fault of released parties Drs. Mestad, Binda and Powers. Plaintiffs claim that defendant failed to timely amend its pleading to add claims against Drs. Mestad, Binda and Powers as required by Missouri law, and defendant failed to timely supplement its answers to interrogatories identifying expert witnesses against these released parties.

At the pretrial conference on February 8, the trial court granted defendant leave to amend its answers to apportion fault and to supplement its interrogatory answers allowing defendant to call some of plaintiffs' expert witnesses, which plaintiffs had decided not to call. Plaintiffs now claim the amendments were severely prejudicial to their claim requiring them to substantially alter their proof at the last minute in order to prepare for the allegations in the amendments.

■ Plaintiffs correctly argue that comparative fault is an affirmative defense which must be pleaded. The reason for such a rule is to give notice to the opposing parties so they may adequately prepare the issues. *Schimmel Fur Co. v. American Indem. Co.*, 440 S.W.2d 932, 939 (Mo.1969). Children's Mercy moved to amend its pleadings to enable it to apportion fault to the non-party physicians. Although allocation of fault to non-parties is generally not permitted, Chapter 538 permits allocation of fault to those who have already been released from liability by virtue of settlement. Section 538.230. The fault of the non-parties had already been extensively developed through deposition testimony. Plaintiffs' extensive discovery illustrated that they were adequately prepared on this issue. *See C.B.C. Realty, Inc. v. Fisher*, 621 S.W.2d 100, 103 (Mo.App.1981) (where the trial court held that it was not an abuse of discretion to allow party to file a second amended petition on the morning of trial). The amendment presented nothing new to plaintiffs.

■ Plaintiffs also claim they were prejudiced when the trial court allowed defendant hospital to amend answers to interrogatories allowing it to designate additional expert witnesses. Plaintiffs argue that they did not have time to adequately prepare for the witnesses. However, the witnesses that the hospital sought to add were originally designated as plaintiffs' expert witnesses. Plaintiffs' argument that they were somehow unprepared as to the testimony of these experts is unconvincing considering the extensive deposition testimony previously given by each witness.

Trial courts generally are liberal in allowing or disallowing parties to amend pleadings, and such a determination is "primarily within the sound judicial discretion of the trial judge, whose action will not be disturbed where ... there is no showing that such discretion has been palpably and obviously abused." *Parsons Constr. Co. v. Mo. Pub. Serv.*, 425 S.W.2d 166, 174 (Mo.1968). The trial court did not abuse its discretion in allowing defendant's amendments because plaintiffs were not surprised or prejudiced by the amendments. This court finds no abuse of discretion on the trial court's part. Point is denied.

### Periodic Payments Provision

Plaintiffs' other point on appeal is that the trial court erred by overruling plaintiffs' motion to modify the judgment in that the trial court did not properly determine periodic payments pursuant to § 538.220, RSMo 1986. That section dictates that past damages are presently due and payable, but that payments for future damages may be made in periodic installments. The trial court did not distinguish past damages from future damages, and instead applied the periodic payment provision to the entire award. This contention was not preserved in plaintiffs' motion for new trial, and plaintiffs have not offered guidance to either the trial court or this court as to how to determine the pro-rated amount of the past damages in view of the application of the non-economic damages caps. Nevertheless, because the case will be remanded on other grounds, the trial court is directed on remand to determine, after consideration of suggestions from counsel, a division of the award between past damages

and future damages, if the court intends to provide for periodic payments.

### Agency Relationship Between Dr. Jelinek and Children's Mercy

■ This court now turns to a consideration of the points on appeal asserted by Children's Mercy Hospital. The hospital contends that the trial court erred in overruling the hospital's motions for directed verdict with respect to the issue of Dr. Jelinek's agency relationship with the hospital. The hospital argues that plaintiffs failed to meet their burden of proof that Dr. Jelinek's actions were within the scope and course of any agency relationship with the hospital. The hospital contends that no agency agreement existed between Dr. Jelinek and Children's Mercy hospital, and that the hospital had no right to control the details of Dr. Jelinek's work.

Testimony presented by Dr. Binda, an anesthetist, revealed that there were six different departments in the hospital: surgery, anesthesiology, pediatrics, radiology, pathology, and dentistry. Dr. Binda testified that all the departments were components of the hospital and not separate entities. Dr. Binda also stated that although the Department of Anesthesiology at Children's Mercy consisted of a professional corporation known as Anesthesia Associates of Kansas City, Inc., the department did not operate as a separate professional corporation distinct from the hospital. Anesthesia Associates had a written contract with Children's Mercy Hospital which recited that the professional corporation was responsible for the Department of Anesthesiology at Children's Mercy. The contract also provided that "[t]he standards of medical practice and professional duties of Anesthesia Associates shall be determined by the Medical Staff of Children's Mercy." A second contractual relationship existed between "The University of Kansas College of Health Sciences and Hospital, School of Medicine/Department of Anesthesiology" and "The Department of Anesthesiology of the Children's Mercy Hospital" setting forth an agreement which allowed University of Kansas residents to gain experience practicing anesthesiology at Children's

Mercy. The following paragraph was included in the contract terms:

> Residents at the Hospital will be subject to Hospital's rules and regulations and Hospital will have the right to terminate any Resident whose health or performance is detrimental to patient well-being. Hospital will retain full responsibility for the care of its patients and will maintain administrative and professional supervision of Residents at Hospital in regard to the operation of the Hospital and the direct and indirect care of patients.

Thus, express agreements existed between the Department of Anesthesiology and both Children's Mercy and the University of Kansas. Dr. Jelinek was a participant in the residency program at the University of Kansas and became a participant under the express agreement between Children's Mercy and the medical school.

From the evidence presented at trial, the jury was entitled to find that the Department of Anesthesiology, together with all the employees working in the department, were an integral component of the hospital. The doctors and residents working in the department contracted with the hospital to provide medical care to its patients. The hospital controlled the work schedules of the residents. The hospital had the discretion to terminate the relationship between the hospital and the residents under certain circumstances. The hospital retained control of the care of its patients. Dr. Binda testified that the hospital had a right to control Dr. Jelinek's conduct with regard to medical care. Plaintiffs presented testimony that the residency program worked for the benefit of both the resident, in gaining hands on experience and training, and the hospital, in allowing other physicians to be available to attend to other hospital functions.

For the foregoing reasons, this court concludes that the trial court did not err in overruling defendant's motions for directed verdict because plaintiffs were entitled to submit to the jury the issue of the agency

of Dr. Jelinek with regard to Dr. Jelinek's alleged negligent acts.

### Agency Relationship Between Dr. Sharp and Children's Mercy

Appellant hospital claims the trial court erred in overruling its motions for directed verdict regarding the issue of the agency or employment of Dr. Sharp, the supervising surgeon. The hospital contends that plaintiffs failed to prove either that Dr. Sharp was acting within the scope and course of any agency relationship with the hospital, or that he committed any negligence while acting within the course and scope of his employment with Children's Mercy. The jury allocated 2% of the fault to Dr. Sharp. Dr. Sharp had already settled with Plaintiffs and been released from liability. The release of Dr. Sharp may not have released the hospital from vicarious liability. *Manar v. Park Lane Medical Center*, 753 S.W.2d 310 (Mo.App.1988). Nevertheless, since the judgment entered by the trial court did not include any liability for the hospital as to Dr. Sharp's negligence, the hospital could not have been damaged by any error of the trial court in submitting to the jury the issue of vicarious liability of the hospital for Dr. Sharp's actions.

### Jury Instruction No. 13

Appellant argues in its next point on appeal that the trial court erred in submitting Instruction No. 13 to the jury because the instruction contained an improper definition of "scope and course of agency." Instruction 13 was the verdict directing instruction encompassing plaintiffs' negligence claim against the hospital based on the agency of Dr. Sharp. Again, since the trial court did not include in the judgment any liability of the hospital for Dr. Sharp's negligence, that point is also moot on this appeal.

### Verdict Form A

Children's Mercy next contends that the trial court erred in submitting Verdict Form A to the jury because Verdict Form A was inadequate and misleading in that it did not provide adequate opportunity for the jury to indicate its findings on each of plaintiffs' separate claims against the hospital. The hospital failed, however, to raise a timely objection at trial. Appellant first questioned the use of Verdict Form A in its motion for new trial. Missouri law provides that an objection to a verdict form may not be raised for the first time in a motion for new trial. *Potts v. Pennco, Inc.*, 708 S.W.2d 222, 225 (Mo.App.1986); *Turley Martin Co. v. American Can Co.*, 661 S.W.2d 79, 82 (Mo.App.1983). To be timely raised, an objection to a verdict form must be raised either at the instruction conference, or when the verdict is returned by the jury, before it is accepted by the court. *Potts*, 708 S.W.2d at 225. Appellant in this case failed to make an objection to Verdict Form A at either of these opportunities. Due to appellant's failure to timely object to the Verdict Form A at trial, any objection raised in a motion for new trial or on this appeal is waived. *Reed v. Sale Memorial Hosp. and Clinic*, 741 S.W.2d 819, 825 (Mo.App.1987). No request was made for this court to review use of Verdict Form A for plain error and this court concludes that plain error review would not be appropriate for this alleged error. This point is denied.

### Non–Economic Damages Awarded to Julia Adams

The hospital contends that the trial court erred in overruling the hospital's motion for judgment notwithstanding the verdict regarding the jury's award of non-economic damages to Julia Adams. The hospital contends that such damages are not recoverable under Missouri law in that the parent of an injured minor child may recover only the value of the loss of the child's services and the extraordinary expenses incurred in caring for the child as a result of the injury.

The petition in this case recites in behalf of plaintiff Julia Adams that Ms. Adams has suffered, as a result of defendants' negligence, economic damages related to the care and treatment of Nicole Adams. It also alleges that Julia Adams has suffered loss of "services, society, companion-

ship, and consortium" of her child Nicole, and seeks recovery for both the economic and non-economic damages.

■ The jury awarded Julia Adams $250,000.00 for past non-economic damages which she sustained as a direct result of Nicole's injuries. Since the damages are non-pecuniary in nature,[3] they are damages for "loss of consortium," which was the only non-economic loss pleaded by plaintiffs. *See* § 538.205(7), RSMo 1986. The recent decision in *Powell v. American Motors Corp.*, 834 S.W.2d 184 (Mo. banc 1992) rules this issue. In *Powell* the court refused to recognize a cause of action for consortium damages brought by a parent or a child. The Court stated that if such a cause of action is to exist, it should be created by the legislature and not by the judicial system. *Id.* at 185. The Court listed several reasons why the judiciary has been reluctant to recognize such a cause of action, including "the threat of double recovery, the concern of the courts over the increased social burden through multiplication of litigation and the burden of increased insurance costs." *Id.* Longstanding Missouri case law provides that a parent can recover only damages for injuries to his or her children consisting of loss of services or earning power and medical bills. *Wilson v. Lockwood*, 711 S.W.2d 545, 554 (Mo.App.1986).

Plaintiffs argue that the Missouri Approved Instructions 34.01 and 4.18 show the intent of the Missouri Supreme Court that such damages are recoverable. MAI 31.04 and 4.18 discuss loss of consortium damages for a plaintiff with a derivative claim. Both instructions were drafted for derivative claims of a spouse or parent. In MAI 31.04, entitled "[1991 Revision] Verdict Directing Loss of Consortium, Loss of Services or Medical Expenses Spouse or Child Injured," the jury is instructed that it may find that the plaintiff with the derivative claim did sustain damage if plaintiff's damage was a direct result of the injury to

the spouse or child. MAI 4.18, entitled "[1991 New] Damages Personal Injury and Loss of Consortium, Loss of Services or Medical Expenses Spouse or Child Injured," provides that if the jury finds the plaintiff with the derivative claim did sustain damage as a direct result of injury to spouse or child, the jury is instructed to award such plaintiff damages which will "fairly and justly compensate plaintiff … for any damages due to injury" to the spouse or child. These jury instructions do not explicitly provide that loss of consortium damages are necessarily recoverable for a parent or child. The *Powell* decision clarifies this issue, explicitly holding that such damages are not recoverable by a parent. Thus, plaintiffs' argument fails in light of the *Powell* decision.

Accordingly, this court concludes that the award of past non-economic damages to Julia Adams must be reversed.

*Testimony Concerning Security Guards*

The hospital contends that the trial court erred in overruling appellant's objections to Julia Adams' testimony concerning her confrontation with hospital security guards. Appellant argues such testimony was irrelevant, inflammatory and prejudicial in that it was outside the scope of the pleadings, not intended to prove any of the issues at trial and was calculated solely to inflame the jury and engender feelings of resentment toward the hospital.

During Ms. Adams' testimony, over defendants' objections, she was permitted to describe an instance in which, after seeing indications that something had gone very wrong, she went into the recovery room and refused to leave when asked. She observed her daughter, who she said appeared swollen up and purple in color, being worked on. A security guard was called, some words were exchanged, and Ms. Adams ended up staying in the waiting room until she was able to see Nicole. The security guard's comments were excluded

---

**3.** The statutory definition of non-economic damages includes those damages "arising from non-pecuniary harm including, without limitation, pain, suffering, mental anguish, inconvenience, physical impairment, disfigurement, loss of capacity to enjoy life, and loss of consortium…." Section 538.205(7).

under a hearsay objection, and Ms. Adams testified that she said, "Sir, I am not leaving this. This is my child. Something is wrong, and you can tell me. And call—you can call as many guards as you want."

 Generally, a trial court's ruling on the admission of evidence will be upheld unless an abuse of discretion is shown. *O'Laughlin v. Barstow*, 654 S.W.2d 95, 97 (Mo.App.1983). This is true with equal force regarding issues of relevancy. *State ex rel. Mo. Highway and Transp. Comm'n v. Meramec Valley Elevator, Inc.*, 782 S.W.2d 642, 645 (Mo.App.1989). Plaintiffs' counsel in this case sought to establish the order and nature of events surrounding Nicole's surgery as perceived through the eyes of Ms. Adams. While the dramatic effect of this testimony may have outweighed the relevance (in view of the fact that Julia Adams is not entitled to recover for non-economic damages), the injuries and the damage testimony were sufficiently dramatic apart from this incident that it is unlikely that this testimony had an effect on the result. To the extent that such incident may have been considered by the jury in awarding non-economic damages to Julia Adams, any error is corrected by the reversal of the award of non-economic damages to Ms. Adams. This point is denied.

### *Dr. Farrell's Deposition Testimony*

The hospital claims the trial court erred in allowing the plaintiffs to present Dr. Susan Farrell's deposition at the end of the case because the evidence was not proper rebuttal evidence. Plaintiffs asked counsel for defendant Children's Mercy Hospital earlier in the case whether they were going to call Dr. Farrell, an employee of Children's Mercy, to testify in defendant's case. Plaintiffs specified to the court and to opposing counsel that they intended to adduce evidence from Dr. Farrell, and that they would wait until Dr. Farrell was presented in defendant's case if defendants were going to call her. Counsel for Children's Mercy represented to plaintiffs' counsel that the hospital planned to call Dr. Farrell to testify. After the close of plaintiffs' evidence, the hospital decided not to call Dr. Farrell to testify. Plaintiffs then sought permission from the court to read portions of the deposition testimony into the record. All defendants objected to the request, claiming this would be improper rebuttal evidence. The court agreed that it would not be proper rebuttal, but allowed plaintiffs to reopen their case for this limited purpose. The hospital now claims the court erred because the evidence had the effect of rebuttal evidence.

 Missouri law provides that the trial court has discretion to allow a party to reopen his or her case for any purpose and that such decision will not be overturned unless an abuse of discretion is found. *Carrel v. Carrel*, 791 S.W.2d 831, 835 (Mo. App.1990); *Chrisler v. Holiday Valley, Inc.*, 580 S.W.2d 309, 314 (Mo.App.1979). The party claiming error must show that injury resulted to his or her case in order for an appellate court to interfere with the trial court's decision. *Fowler v. S–H–S Motor Sales Corp.*, 560 S.W.2d 350, 357 (Mo.App.1977). If there is no inconvenience to the court, or unfair advantage to one of the parties, it would constitute an abuse of discretion not to allow the introduction of material evidence. *In the Interest of S–G.G—*, 779 S.W.2d 45, 54–55 (Mo. App.1989).

 Appellant argues that it was injured by the reading of the deposition testimony because allowing the reading immediately after defendants had rested unnecessarily highlighted the testimony and gave it undue emphasis. Appellant also claims that plaintiffs' attorneys had made a strategic decision not to call Dr. Farrell in their case in chief because they were concerned about the length of time consumed in the presentation of their case. Appellant indicates that defendants later made the same tactical decision to abbreviate their evidence by dispensing with Dr. Farrell's testimony. The question of what was fair under the circumstances was for the discretion of the trial judge. The testimony would have been presented earlier except for the fact that the hospital indicated its intention to call Dr. Farrell in its case. Plaintiffs' counsel also tried several times

before defendants rested to introduce the evidence. However, the trial court preferred to allow defendants the opportunity to present all their witnesses first. All of this was well within the trial court's discretion, and could not be said to be unfair to either side. In any event, a review of Dr. Farrell's testimony shows that it was not of great consequence one way or another. There was no abuse of discretion.

■■■ The hospital also contends that the introductory remarks of plaintiffs' attorney prior to reading from Dr. Farrell's deposition, identifying her as an "employee" of Children's Mercy Hospital, amounted to an improper comment upon the hospital's failure to call Dr. Farrell as a witness because Dr. Farrell was equally available to both sides and was actually under subpoena from plaintiffs' attorneys during trial. This court does not agree that there was any impropriety. There is no showing that there was anything unfair or improper about the characterization of Dr. Farrell as an "employee," and counsel was entitled to orient the jury to the identity of Dr. Farrell. Accordingly, this court concludes the trial court did not abuse its discretion in allowing plaintiffs to reopen their case and read portions of Dr. Farrell's deposition testimony into evidence. This point is denied.

### Exclusion of Annuitist Testimony

■■■ Children's Mercy contends that the trial court erred in refusing to allow defendant to introduce an annuitist's testimony because the testimony was relevant and probative in that it was a valid and accurate alternative means of proving the present value of plaintiffs' future damages. Prior to the commencement of trial, plain-

tiffs' counsel filed a motion in limine to exclude any testimony from Robert Pavlini, an annuitist, identified by Children's Mercy as an expert witness. The trial court sustained plaintiffs' motion and prohibited Mr. Pavlini from testifying. Children's Mercy made an offer of proof indicating that Mr. Pavlini would have testified that an annuity could be purchased at a cost of $1,183,-855.00 which would provide all of the care needed by Nicole for the rest of her life.

In granting plaintiffs' motion in limine and denying appellant's offer of proof, the trial court concluded that the proposed expert was not an economist, but was actually a salesperson. Mr. Pavlini admitted in his deposition testimony that he was neither a tax expert, an economist or a rehabilitation counselor. He labeled himself as a "structured settlement specialist."

There is no Missouri case law dealing specifically with annuity testimony introduced for the calculation of damages. Other states have addressed this issue and have found testimony from an annuitist to be irrelevant and misleading.[4] Missouri law provides that the trial court has broad discretion in determining whether a witness is qualified to give testimony on a given subject. *Broadview Leasing Co. v. Cape Cent. Airways, Inc.*, 539 S.W.2d 553, 563 (Mo.App.1976). The trial court's decision on admission of evidence will not be interfered with by an appellate court absent a clear abuse of discretion. *Kelly v. Jackson*, 798 S.W.2d 699, 704 (Mo. banc 1990).

■■■ The trial court found that Mr. Pavlini's testimony would not be helpful to the jury and, in fact, had the potential of confusing and misleading the jury regarding their award of damages for Nicole Adams'

4. *See Farmers Union Federated Coop. Shipping Ass'n v. McChesney*, 251 F.2d 441, 444 (8th Cir. 1958) (where the court held that "[t]he cost of an annuity for the remainder of the injured person's life is not the measure of recovery for lost or diminished earning power"); *Gusky v. Candler Gen. Hosp., Inc.*, 192 Ga.App. 521, 385 S.E.2d 698, 701 (1989) (where the court stated, "[e]xpert testimony as to annuities which could be purchased with the settlement proceeds is irrelevant as it is antithetical to the requirement ... that future pecuniary damages are to be

reduced by the jury to the present value"); *Herman v. Milwaukee Children's Hosp.*, 121 Wis.2d 531, 361 N.W.2d 297, 306 (1984) (where the court stated, "[a]dmission of annuity evidence could have misled the jury into believing it must award a lesser sum than the present value of the future losses"); *Gregory v. Carey*, 246 Kan. 504, 791 P.2d 1329 (1990) (where the Supreme Court of Kansas held that annuity testimony constitutes inadmissible hearsay and should be excluded by the trial court).

injuries. This court finds no abuse of discretion on the trial court's part in prohibiting Mr. Pavlini from testifying about annuity contracts. In any event, the reduction of the net award from the jury verdict as a result of the damage caps established by Chapter 538 make it extremely unlikely that any testimony by Mr. Pavlini would have made any difference in the final result. Thus, there is also no showing of prejudice. This point is denied.

### Statements Made During Closing Arguments

The hospital also argues that the trial court erred in allowing the plaintiffs' attorney to make various improper comments during closing arguments. Appellant alleges that plaintiffs' counsel's comments calling Dr. Jelinek an "immoral" and "amoral" person and instructing the jury about the effects of apportionment of fault on collectibility of the judgment in closing argument were clearly improper and prejudicial in that they were calculated to arouse and inflame the jury's passions and prejudices, and to mislead and confuse the jury with issues outside the evidence.

██ No objection was raised by appellant regarding either of these comments during closing argument. To preserve a claim of error for appellate review for improper closing argument, a party must object to the allegedly erroneous argument at the time it is made. *Sandy Ford Ranch, Inc. v. Dill,* 449 S.W.2d 1, 7 (Mo.1970); *Porter v. Bi–State Dev. Agency,* 710 S.W.2d 435, 437 (Mo.App.1986). Appellant thus requests this court to review these remarks as plain error under Rule 84.13(c). Each comment will be evaluated separately.

██ Generally, trial counsel is accorded wide latitude in arguing the facts of a case. The trial court has broad discretion in determining proper guidelines. *Kelly v. Jackson,* 798 S.W.2d 699, 704 (Mo. banc 1990). In the present case, while describing the conduct of Dr. Jelinek, counsel for plaintiffs made the following comments during closing argument:

She did it with her own hands. No one told her to do it. No one else did it. She put 7,000 cc's of water, poured it into the veins of Nicole Adams. She did it. It was her decision to do it.

And then after that, what did she do? Knowing that, she left Nicole in the recovery room, went on to her next case, knowing what she knew. Dr. Ryan felt so strongly about that that he said it was more than negligent, it was immoral for her to leave that child in the recovery room. That was the word he used because it was so negligent of her to do that.... Ladies and gentlemen of the jury, you have had an opportunity to observe her demeanor, to assess her character. This is a woman who sat that far away from the mother of the child she blinded and brain damaged, never a flicker of concern, never an expression of emotion, nothing.

You know Dr. Ryan was only half right: She is not just immoral, she is amoral. She has no morals, for her to do what she did and leave that child.

██ No objection was made by any of the defendants in this case regarding the propriety of this comment at the time it was made. The comments are reviewable only for plain error. *Sandy Ford Ranch, Inc. v. Dill,* 449 S.W.2d 1 (Mo.1970). Rule 84.13(c) provides that an appellate court can consider plain error "when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." The jury had an opportunity to hear the evidence, including the testimony of Dr. Jelinek that when she left she did not know that Nicole Adams was in critical condition. Also, the jury had an opportunity to observe Dr. Jelinek's demeanor during the trial, and the jury was capable of judging the fairness or unfairness of these comments by counsel. While this court disapproves of "reckless assertions" intended to "arouse hatred or prejudice" against a litigant, *Hancock v. Crouch,* 267 S.W.2d 36, 44 (Mo.App.1954), nevertheless it is rare that comments made in closing argument rise to the level of plain error. Manifest injustice is not the same as prejudice. It is beyond prejudice. *State v. Hornbuckle,*

769 S.W.2d 89, 92 (Mo. banc 1989), *cert. denied*, 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 128 (1989). In this case, whatever emotions may have been encouraged by this remark cannot be said to have caused a manifest injustice. The jury assigned 82% of the fault to others although the arguments of counsel clearly targeted Dr. Jelinek to receive all of the blame. We do not believe that these remarks had any effect on the result.

Plaintiffs also claim error in comments made by plaintiffs' attorney in discussing the fault of the party defendants. Plaintiffs' attorney stated:

> Ladies and gentlemen, these are the only parties on trial. Those are the only parties on trial. We told you at the very beginning that allegations were made against Sharp, Binda, Mestad, they were there. And they shouldn't be judged by twenty-twenty hindsight because they were there.
>
> The evidence was that any conceivable actions by these four was minimal. Let's focus on the actions of these four. Ladies and gentlemen, there is a reason they don't want you to assess any fault to these parties. Any percentage you give to these four is a percentage of the total verdict that Nicole does not receive.
>
> On behalf of Nicole, I ask you to give zero to these three. If you find Dr. Sharp is an employee and should have the responsibility for that reason, do it, but it would be wrong to give fault to Binda, Powers, and especially fault to Mestad—He brought her back to life, struggled for 19 minutes to do it, and he did it.

While we conclude it is not proper to argue that any fault assigned to a settling defendant is a percentage the "plaintiff does not receive,"[5] once again there was no objection at the time of such argument, and we review only for plain error. With this in mind, it cannot "confidently be said that either of the remarks complained of as they appear in context, improperly influenced the jury to an unjust result." *Sandy Ford Ranch*, 449 S.W.2d at 7. It is clear, in fact, that the jury rejected the approach desired by plaintiffs, allocating a total of 62 per cent of the fault among these four individuals to whom, plaintiffs argued, it would be "wrong" to assign fault. This court finds no plain error as to any comments made in closing argument. This point is denied.

### Direct Negligence Claim

One of the theories of recovery plaintiffs presented in plaintiffs' petition alleged direct negligence on the part of Children's Mercy Hospital in the way the hospital made anesthesia assignments to the resident physicians. The anesthesia surgery assignments were posted on a board outside the surgery rooms at 7:00 a.m. on the day of the scheduled surgery in accordance with the standard practice at Children's Mercy. Dr. Jelinek was not aware of her surgery assignment in Nicole Adams' case until the morning of the surgery. Plaintiffs alleged that the hospital had a duty to have a policy that would make the surgery assignments known to the residents the day before the scheduled surgery so that adequate preparations for the procedures could be made. They alleged that the hospital breached this duty by failing to post the surgery schedule until the morning of the surgery, and that this breach of duty contributed to Nicole's injuries.

The hospital argues on this appeal that the trial court erred in overruling its motions for directed verdict because plaintiffs failed to make a submissible claim of negligence against the hospital. Specifically, the hospital argues that plaintiffs produced no evidence that the hospital had a duty to require the surgery schedule and anesthesia assignments to be posted the day before surgery. The hospital further contends that there was no evidence that failure to have such a policy caused or contrib-

---

**5.** It would not be proper to suggest to the jury that the plaintiffs received no compensation from the defendants which had already settled. In fact, plaintiffs had received approximately $5.5 million. The function of the jury is to determine fault and damages without reference to prior settlements.

uted to Nicole Adams' injuries, and that the 20% fault allocation must be set aside.

■ In making the determination of whether plaintiffs made a submissible case against defendant hospital, this court views the evidence in the light most favorable to the plaintiffs, giving plaintiffs the benefit of all favorable evidence and reasonable inferences to be drawn therefrom, and this court disregards all evidence contrary to plaintiffs' claim. *Delisi v. St. Luke's Episcopal-Presbyterian Hosp.,* 701 S.W.2d 170, 173 (Mo.App.1985). To make a prima facie negligence claim, a plaintiff must show the existence of a duty to be performed by the defendant, a breach of the existing duty, and that the resulting injury was caused by defendant's breach of duty. *Krause v. United States Truck Co.,* 787 S.W.2d 708, 710 (Mo. banc 1990). Generally, expert testimony must be introduced in order to establish the standard of care in a medical malpractice case. *Dine v. Williams,* 830 S.W.2d 453, 456 (Mo.App.1992). In order to establish a prima facie negligence case, plaintiffs were required to show that Children's Mercy Hospital failed to exercise that degree of skill and learning ordinarily exercised under the same or similar circumstances. *Cf. Delisi,* 701 S.W.2d at 173.

It is significant that the claim of negligence in failing to provide adequate notice of the surgery assignment was not a claim of failure to supervise Dr. Jelinek during the surgery. Presumably, such claims were resolved prior to trial by settlement of the claims against Dr. Sharp, Dr. Mestad, and Dr. Binda, all of whom allegedly had responsibilities to supervise Dr. Jelinek. This claim of negligence is strictly a claim of failure to provide adequate notice. It is also significant that there is no claim that Dr. Binda did not have adequate notice (and the fact is he did have notice the day before surgery).

■ To establish the hospital's alleged duty to assign surgery schedules the day before the scheduled surgery, plaintiffs presented testimony from Dr. John F. Ryan, a Boston pediatric anesthesiologist. Dr. Ryan testified that the standard practice with regard to assignment of surgeries to resident anesthetists is that the assignment is made "usually the afternoon before." Dr. Ryan testified that the fact that the assignment in this case was made the morning of the surgery was significant in that it is a very important part of the training of the residents to have the resident see the patient, make an anesthesia plan, and present it to the senior anesthetist for modification or approval. Dr. Ryan also stated that one cannot "rationally take care of the patient throughout the anesthetic if you haven't preoperatively made the assessment and decide what plan you are going to use and what are the patient's problems and how are you going to manage their anesthetic." Dr. Keith Kimble, a pediatric anesthesiologist practicing in Los Angeles, testified by deposition as follows:

I think that, had the schedule been made up the day before, then Dr. Jelinek would have had an opportunity, as would Dr. Binda, to have seen the patient the night before, and they would have had an opportunity, with no time constraints on them at all, to discuss in whatever length seemed appropriate, how they were going to go about managing the case, and I think that plans could have been laid in a clear and organized fashion. And, had that been done, I think it's less likely, substantially less likely, that Nicole would have ever been given 7 liters of crystalloid, which certainly was one of the things that got the snowball rolling in this case.

■ It is argued by plaintiffs that the opinions of Dr. Kimble and Dr. Ryan constitute sufficient evidence to create a submissible issue as to whether the hospital's policy of assigning anesthesia cases the morning of the scheduled surgery, instead of the day before, caused or contributed to Nicole Adams' injuries. A close examination of these opinions, however, indicates that the opinions are based upon assumptions which are not supported in the evidence. Dr. Ryan expressed his view that a resident cannot rationally develop a plan as an anesthetist without opportunity to make a pre-operative assessment. The clear assumption here is that no anaesthesia plan

was developed prior to surgery in this case. The same is true of Dr. Kimble's testimony that, if there had been more notice to Dr. Jelinek, plans "could have been laid in a clear and organized fashion." Dr. Kimble assumes Dr. Jelinek and Dr. Binda were forced into circumstances leaving them without adequate time to develop an anaesthesia plan. Yet plaintiffs presented no competent evidence that the physicians failed to develop a plan, or that time constraints actually hindered the development of a plan. The opinions of Dr. Ryan and Dr. Kimble, therefore, rest upon speculation. The evidence was completely contrary to their speculation. Both Dr. Binda and Dr. Jelinek indicated that Dr. Binda developed a definite plan for Nicole's case. He reviewed the records and conferred with Nicole's mother the day before surgery. Since Nicole was a normal, healthy eight year old, there were no unusual measures required. Dr. Binda testified that his plan for fluid management, if followed, would have resulted in the administration of 2400 to 2800 cc's of fluid rather than 7000 cc's. Dr. Jelinek testified that Dr. Binda communicated the plan to her and, since she was in only her eighth day of anaesthesia residency, she did not feel capable of criticizing or contributing to the plan. While there is a certain logic to the suggestion that Dr. Jelinek may have performed better if she had been better prepared, plaintiffs presented no evidence directly supporting the inference that Dr. Jelinek would have done anything differently if she had been provided more notice. Dr. Ryan's testimony suggests that the reason for giving more notice is to provide a better educational experience for the residents, and his testimony is not addressed specifically as to how Nicole Adams would have received better care if Dr. Jelinek had received more notice. Dr. Kimble also fails to delineate exactly how the provision of notice would have made a difference in the performance of Dr. Jelinek. The surgery took place at 2:00 p.m., seven hours after Dr. Jelinek was notified she would be participating in the surgery. There was no evidence, apart from the speculative opinions of Dr. Ryan and Dr. Kimble, that Dr.

Jelinek would have done anything in particular different in preparation for the surgery, no matter how much notice she had. Consequently, the opinions of Dr. Ryan and Dr. Kimble on the issue of whether the lack of prior notice caused or contributed to the injuries amount to nothing more than opinions which are based upon assumptions not supported in the evidence. Such opinions are not sufficient to create a submissible case or to sustain a judgment. A medical expert's opinions must be supported by competent evidence which will give the opinion sufficient probative force to be substantial evidence. *Pippin v. St. Joe Minerals Corp.*, 799 S.W.2d 898, 904 (Mo.App. 1990). This is true even when the opinion is received without objection. *Id.* There seems to be little doubt that the jury could have found Dr. Jelinek's performance was inadequate. There also seems to be little doubt that the jury could have found that the supervising physicians failed to supervise Dr. Jelinek properly. However, it is a stretch of the imagination to suggest that the relatively short notice provided to Dr. Jelinek actually contributed to the injuries under the facts of this case. The verdict as to the hospital for direct negligence must be set aside.

When this verdict is set aside, we are confronted by the fact that the remaining fault allocations (18% for Dr. Jelinek and 62% for the "settling defendants") total only 80%. The total fault allocations must equal 100%. The question is whether a new trial is necessary where it is reasonable to conclude that, as between Dr. Jelinek and the "settling defendants," the jury would have found the same relative proportion of fault if the claim against the hospital for direct negligence had not been permitted to go to the jury.

This issue was faced in *Kibbons v. Union Elec. Co.*, 823 S.W.2d 485 (Mo. banc 1992), where an action was brought against a real estate developer ("Green") and Union Electric, an electric utility company, to recover for the death of plaintiffs' decedent, who was electrocuted at a construction site when the bed of a dump truck came in contact with a high voltage line

maintained by Union Electric. The jury allocated 30% of fault to Green, 30% to Union Electric and 40% to the decedent. Judgment was entered jointly and severally, against both defendants, in the amount of $1.8 million, which corresponded to 60% of the damages. Upon appeal, the Missouri Supreme Court determined that plaintiffs failed to make a submissible case against Green, and reversed the judgment against Green. The court then considered whether it could modify the judgment without having to order a new trial. It noted that under Section 2(d) of the Uniform Comparative Fault Act, the uncollectible share of one defendant may be reallocated among other defendants and among a claimant at fault. Thus, the court concluded there is precedent for the concept of reallocating fault on a pro-rata basis, where one party's liability has been deleted. The court held, however, that in the particular circumstances of *Kibbons*, reallocation would not be appropriate, because the jury's verdict in that case was ambiguous. In explaining its decision, the court stated:

> On the one hand, the jury may have concluded that the decedent's negligence amounted to somewhat less than half of the total negligence that led to his death. Such a conclusion would permit an assignment of fault to the decedent of 40 percent and to the defendants cumulatively of 60 percent.

> On the other hand, the jury could have compared the decedent's negligence to Green's fault and then to [Union Electric's] fault and concluded that in each instance the decedent's fault exceeded that of each defendant. Such reasoning would support a verdict showing 40 percent fault to the decedent and 30 percent to each of the defendants.

> It is simply impossible to divine which reasoning this jury applied. Thus, we cannot know what this jury would have intended if confronted with these facts and only permitted to apportion fault between the decedent and [Union Electric].

*Kibbons*, 823 S.W.2d at 491–92. The court remanded the case to allow a jury to allocate fault between the decedent and the electric company. The jury was to be instructed that it must assess at least 40% fault and not more than 70% of the fault to the decedent, and at least 30% and not more than 60% to the electric company.

In this case, the jury allocated fault among five tort-feasors: Children's Mercy Hospital, Dr. Jelinek, Dr. Sharp, Dr. Mestad, and Dr. Binda. No fault was allocated to the plaintiffs. It is clear that the relative fault of each defendant was in comparison to that of the others, and not in comparison to any fault of the plaintiffs. Since there was no submissible case against the hospital for direct negligence, the hospital drops out, and the others bear the same relative percentage to each other. Thus, this court has the discretion to re-allocate the fault on a pro-rata basis. *Id.* This court may pro-rate the 20% of additional fault according to the relative proportions of fault determined by the jury as to the other actors. Accordingly, the fault, as pro-rated, will be re-allocated as follows: Dr. Jelinek: 22.5%; Dr. Sharp: 2.5%; Dr. Mestad: 62.5%; and Dr. Binda: 12.5%. Drs. Sharp, Mestad, and Binda have already settled, so the re-allocation of fault has no effect upon them. As to Dr. Jelinek, the re-allocation increases her proportion of fault from 18% to 22.5%. Since the jury found Dr. Jelinek to have been acting as the agent of Children's Mercy Hospital, the hospital and Dr. Jelinek are jointly and severally liable for the judgment attributable to Dr. Jelinek's negligence.

*Conclusion*

The judgment is vacated. The case is remanded to the trial court for entry of judgment against Children's Mercy Hospital and Dr. Jelinek in accordance with an allocation of 22.5% of the fault to Dr. Jelinek, who was found by the jury to be the agent of Children's Mercy Hospital. The judgment should be fashioned in accordance with the provisions of § 538.220, RSMo 1986, including, on some reasonable basis, an allocation between past damages and future damages, if periodic payments are to be part of the judgment. The trial court should also make a determination as

to any interest to be allowed on any payments of future damages. The judgment will not include any award to Julia Adams for non-economic damages.

All concur.