**Peggy L. CLINE, Respondent,**

v.

**WILLIAM H. FRIEDMAN & ASSOCIATES, INC., d/b/a Park Central Institute, Appellant.**

**No. 64481.**

Missouri Court of Appeals, Eastern District, Division Four.

Aug. 30, 1994.

---

Robert C. Seibel, Jr., Curtis R. Bailey, Clayton, for appellant.

Morris Chapman, Granite City, IL, Mellissa Chapman, Clarence Harrison, St. Louis, for respondent.

CARL R. GAERTNER, Judge.

Defendant, William H. Friedman & Associates, Inc., d/b/a Park Central Institute, appeals from a judgment in favor of plaintiff, Peggy Cline, in the amount of $536,750 in a medical malpractice action. We reverse and remand.

On February 1, 1988, plaintiff consulted with William H. Friedman at the Park Central Institute [1] about her desire for corrective eyelid surgery. Plaintiff was concerned that her eyelids were sagging, making her look old and tired. After conducting a physical examination, Dr. Friedman recommended that plaintiff undergo bilateral blepharoplasty, a surgical procedure in which excess skin, tissue and fat is removed from both the upper and lower eyelids. Plaintiff consented, and Dr. Friedman scheduled the surgery for February 15, 1988. Dr. Friedman claims he also explained to plaintiff that blepharoplasty involves the risks of blindness, infections, allergic reactions to anesthesia, and temporary lagophthalmus.[2] Plaintiff, however, testified that the doctor did not inform her of the risk of lagophthalmus.

Dr. Friedman performed the blepharoplasty without any complications. After a brief stay in the recovery room, plaintiff returned home. Later that evening, plaintiff discovered that she could not completely close her eyelids and that her upper lids would spasm when she attempted to close them, forcing her to tape shut the lids in order to sleep.

Plaintiff returned the next day for a follow-up visit. She claims she told Dr. Friedman she could not completely close her eyelids. Dr. Friedman, however, testified that plaintiff never expressed a complaint and that he noted no problems after examining her. Dr. Friedman again examined plaintiff on February 22, 1988, and noted no problems. Plaintiff, however, testified that she complained she still could not close her eyes and her vision was blurred. On February 29, 1988, an ophthalmologist examined plaintiff and prescribed a lubricating ointment to treat her symptoms. On March 7, 1988, plaintiff returned to see Dr. Friedman and expressed a number of complaints, including an inability to close her eyelids, blurred vision, eye dryness, near blindness and depression. The doctor examined her, noted that her eyes were inflamed and diagnosed plaintiff as having bilateral lagophthalmus. Concerned that she might have corneal exposure,[3] he referred plaintiff to an ophthalmologist, Dr. Frank O'Donnell.

Plaintiff went to O'Donnell's office, and Dr. Byron Santos examined her. He recommended that she continue patching her eyes at night and that she apply lubricating drops and a prescribed lubricating ointment on her eyes. Plaintiff went to another ophthalmologist, Dr. Michael Beatty, on March 10, 1988. Beatty examined plaintiff, concurred with Santos' recommendations and also advised that she massage cocoa butter on her upper eyelids.

Dr. Friedman examined plaintiff for the last time on March 14, 1988. During this

---

1. In 1987, Dr. Friedman and five other physicians formed the Park Central Institute to handle facial plastic surgery.

2. Lagophthalmus is a condition in which the eye cannot be completely closed.

3. The terms corneal exposure, exposure keratitis and punctate keratophathy are used interchange-

ably to refer to the inflammation, disease, scratching, or cracking of the cornea. Lagophthalmus prevents the eyelids from spreading a sufficient amount of tears across the corneas to wash them. The corneas then become dry which leads to cracking, scratching, inflammation and eventually disease on the surfaces of the eyes.

visit, plaintiff complained of retro-orbital pain, blurred vision, and scratchiness in her eyes. When plaintiff attempted to close her eyes, the upper lids would flutter. The doctor noted that her eyelids appeared to be healing properly, her eyes were tearing properly, she could achieve almost total eyelid closure, and he could achieve total closure by exerting gentle pressure on her brow.

From March 15, 1988, until January 1993, plaintiff was examined by a number of eye specialists. These specialists did not change her treatment, and they all observed varying degrees of lagophthalmus and corneal exposure in the lower portion of plaintiff's corneas.

After a five-day jury trial, the jury returned a verdict in favor of plaintiff for $674,750. The trial court remitted $138,000 as being in excess of the maximum recovery allowable for non-economic damages in a medical malpractice case, § 538.215 RSMo. 1986, and denied defendant's motions for new trial, for judgment notwithstanding the verdict and for further remittitur. This appeal followed.

I. Submissible Case

In its first point, defendant claims the trial court erred in denying its motions for a directed verdict and for judgment notwithstanding the verdict because plaintiff failed to make a submissible case of negligence.

In determining whether plaintiff made a submissible case, we must consider the evidence and all reasonable inferences therefrom in the light most favorable to plaintiff, disregarding all evidence contrary to her claim. *Adams v. Children's Mercy Hospital*, 848 S.W.2d 535, 547 (Mo.App.1993). If it may be fairly inferred that defendant was negligent, the evidence is sufficient. However, if the jury can only determine the question of negligence by resorting to conjecture and surmise, plaintiff has failed to make a submissible case. *Pettet v. Bieterman*, 718 S.W.2d 188, 189–90 (Mo.App.1986).

To make a submissible claim of medical malpractice, plaintiff must establish that defendant's acts or omissions: (1) failed to meet the requisite standard of care; (2)

were performed negligently; and (3) caused her alleged injuries. *MacDonald v. Sheets*, 867 S.W.2d 627, 630 (Mo.App.1993). Generally, in a medical malpractice case, plaintiff must introduce expert testimony to prove that defendant failed to exercise the degree of skill and care ordinarily used under the same or similar circumstances by members of his or her profession. *Id.*

In the present case, plaintiff offered the expert testimony of Dr. Martin Feurman, an ophthalmologist, to establish Dr. Friedman's deviation from the standard of care. Feurman testified that virtually every eye specialist that examined plaintiff after the blepharoplasty noted that: (1) plaintiff was unable to close her eyelids completely because her upper lids were too short to cover her corneas; (2) too much skin had been removed from plaintiff's upper lids; (3) plaintiff had corneal exposure in the lower portion of her eyes; and (4) the lower portion of plaintiff's corneas had a similar pattern of fissures, cracks and scratches.

Feurman testified that according to some medical publications excessive removal of eyelid skin may result in inadequate eyelid closure with corneal exposure. After examining plaintiff prior to trial, Feurman noted that plaintiff had corneal exposure in the lower portion of her corneas with the same pattern of cracks and breaks that her treating physicians had observed. Feurman pointed out that the pattern and location of plaintiff's corneal exposure indicated that the cause was not medication but excessive resection of the upper lids. Feurman then concluded that Dr. Friedman's performance of the blepharoplasty fell below the standard of care "[b]ecause the lid is too short, the cornea's been exposed and this is an indication that too much tissue was removed."

Defendant argues that plaintiff failed to offer evidence that Dr. Friedman breached the standard of care because Feurman's opinion was based solely on the adverse result of the blepharoplasty. Defendant claims this failure to establish a breach of the standard of care was exhibited in the following exchange during the cross-examination of Feurman:

Q: [by defendant's attorney] Now sir, can you quantify for me how much skin, tissue and fat Mrs. Cline needed to have removed from her right eyelid?

A: You can't quantify that. It's a judgment call and you're using forceps and lifting up tissue to make a pleat. You mark that and then you excise that, and each person is different. And in fact probably both eyelids would be a different exact amount. There is no rule or formula you can use.

Q: So as you sit here today, you can't tell me how much skin needed to be removed from either the right eye or left eye of Mrs. Cline during her blepharoplasty?

A: I can only tell you a month later if too much skin was taken out or a year later. I couldn't tell you at the time of surgery. That's the judgment of the person doing the surgery.

Q: And sir, as you sit here today you cannot tell me how much skin or tissue my client removed during the blepharoplasty, can you?

A: He didn't say in his operative report. He didn't say.

Q: And you don't know?

A: I don't know how much he took out.

Q: The only thing you're going by, sir, is the end result?

A: Correct.

■ In a medical malpractice action, a presumption of negligence based solely on an adverse result is not permitted. *Barr v. Plastic Surgery Consultants, Ltd.*, 760 S.W.2d 585, 590 (Mo.App.1988); *Miller v. Scholl*, 594 S.W.2d 324, 329 (Mo.App.1980). "Proof of facts essential to submissibility of a case may not rest on speculation or conjecture." *Mills v. Redington*, 736 S.W.2d 522, 524 (Mo.App.1987). However, an adverse result is a fact which may be considered, provided it does not constitute the complete basis for the expert opinion. *Barr*, 760 S.W.2d at 590.

Plaintiff clearly did not present the speculative proposition that Dr. Friedman negligently performed the blepharoplasty simply because she suffered a bad result following the surgery. Feurman repeatedly testified that the doctor removed too much skin and tissue from plaintiff's upper lids. He clearly and unequivocally explained that he reached this conclusion based upon medical publications, the treating physicians' records and his own examination of plaintiff.

■■ Contrary to defendant's argument, there is nothing sinister in Feurman's inability to quantify the amount of skin and tissue Dr. Friedman removed and the amount he should have removed from plaintiff's eyelids. As Feurman testified, the appropriate amount of skin and tissue that should be excised during a blepharoplasty varies with each individual and often with each eyelid. He testified repeatedly that Dr. Friedman deviated from the accepted standard of care in performing the blepharoplasty on plaintiff by resecting too much skin. That he made this determination by an after-the-fact examination is not tantamount to concluding that malpractice occurred solely because of an adverse result of the surgery. Plaintiff clearly made a submissible case. Point denied.

## II. Rebuttal Testimony

In its second point, defendant alleges the trial court erred in allowing plaintiff to introduce evidence of another case of permanent dry eye incurred in another blepharoplasty performed by Dr. Friedman because the evidence was collateral, irrelevant and prejudicial to defendant.

On cross-examination, Dr. Friedman was questioned about his statement during a deposition that he had never encountered another case of permanent dry eye. He responded that prior to this case he had never had a patient who suffered permanent dry eye. Later, over defendant's objection, the trial court permitted Katherine McGuire to testify in rebuttal that Dr. Friedman had performed blepharoplasty on her upper and lower eyelids on March 13, 1990, and that she later developed permanent dry eye.

Plaintiff argues that dry eye was an issue in the case and McGuire's testimony was offered to rebut Dr. Friedman's denial of ever encountering another permanent dry

eye case. However, the right of contradiction is limited.

Contradiction is not allowed on collateral matters. When the fact in dispute is of no material significance in the case or is not pertinent to the issues as developed, the matter is collateral. If a party has been permitted in the trial court's discretion to cross-examine a witness as to a collateral matter, the cross-examiner is bound by the witness' answers and will not be permitted to offer evidence to contradict the witness relative to such matters. *Wyatt v. Bearden*, 842 S.W.2d 946, 949 (Mo.App.1992) (citing O'Brien, Missouri Law of Evidence (2d ed.) § 5–4).

The test for determining whether a matter is collateral hinges on whether the party seeking to introduce it for purposes of contradiction would be entitled to prove it as a part of his case. *Frechin v. Thornton*, 326 S.W.2d 122, 126 (Mo.1959). The general rule is that an opposing party is bound by a witness' answers elicited on cross-examination with respect to collateral matters and will not be permitted to introduce extrinsic evidence to refute the answers. *Hurlock v. Park Lane Medical Center, Inc.*, 709 S.W.2d 872, 877 (Mo.App.1985). The rationale underlying this rule is to shield the jury from a proliferation of issues which would require the court to go into the merits of such collateral matters and to avoid the unfairness and surprise of requiring the opposing party to disprove issues not raised by the pleadings. *Id.* In the case at bar, plaintiff has failed to show how the extrinsic evidence in question would serve any purpose independent of mere contradiction.

Plaintiff contends that Dr. Friedman opened up the subject by stating in a deposition that he had never encountered a case of permanent dry eye and by failing to state this position during his direct examination. Therefore, plaintiff contends, cross-examination on this matter merely "narrowed the doctor's prior testimony to a single tangible concept." This argument is absurd. The record indicates that the deposition was never entered into evidence and that it was first referred to during plaintiff's cross-examination of Dr. Friedman. Furthermore, it is ludicrous to maintain that defendant injected the matter into the case by failing to mention the matter in direct examination.

Plaintiff also argues the introduction of the extrinsic evidence was necessary to impugn Dr. Friedman's competency and qualifications to testify as an expert witness. However, as pointed out in *Hurlock*, 709 S.W.2d at 878, "a party waives any objection to the competency of a witness when he fails to make his objection thereto at the earliest available opportunity." Although plaintiff objected to the doctor's qualifications to testify about plaintiff's mental condition, the record is devoid of any objection by plaintiff challenging his competency or qualifications to testify as an otolaryngologist.[4]

The trial court accordingly erred in permitting plaintiff, over defendant's objection, to introduce extrinsic evidence to contradict Dr. Friedman's response concerning a collateral matter elicited during cross-examination. The case must therefore be reversed and remanded for a new trial.

### III. Plaintiff's Mental Condition

In its third point, defendant argues the trial court erroneously prohibited it from gathering and introducing evidence concerning plaintiff's mental condition. Defendant's point centers on the court's refusal to permit it to depose plaintiff's psychiatrist, Dr. Robert Brookes, and the court's exclusion of Brookes' testimony and records.

The admission or exclusion of evidence is within the sound discretion of the trial court. We will not disturb the court's determination on this issue absent substantial or glaring injustice. *Twin Bridges Electric, Inc. v. Collins*, 823 S.W.2d 14, 16 (Mo. App.1991).

Plaintiff initially placed her mental and emotional condition in issue by seeking damages for "mental anguish." During discovery, plaintiff revealed to defendant that Brookes had treated her, released Brookes' medical records concerning plaintiff to defen-

---

**4.** Otolaryngology is the branch of medicine which treats diseases of the ear, nose and throat.

dant, and permitted defendant to depose Brookes.

Defendant later learned that plaintiff sought additional treatment from Brookes for depression and insomnia. Plaintiff released to defendant Brookes' most recent medical records, prompting defendant to subpoena Brookes for a discovery deposition. On the day of the scheduled deposition, however, plaintiff invoked her patient-physician privilege and filed a motion for a protective order to quash the deposition.

The trial court granted plaintiff's motion but ordered her to strike "mental anguish" from her damages allegations. Plaintiff complied with the order and later filed a motion in limine to prevent defendant from referring to her mental condition. The trial court ruled that defendant could introduce evidence concerning any medications plaintiff used but precluded any mention of her mental condition.

Defendant argues that plaintiff waived her patient-physician privilege by placing her mental condition at issue and divulging the privileged communications. Defendant planned to use this evidence to corroborate its own testimony that plaintiff's injuries were caused by hysterical blepharospasm, a condition associated with depression and psychiatric illness.

■■■■ Section 491.060(5) RSMo Supp. 1993 prevents a physician from disclosing by testimony in court or formal discovery confidential medical information acquired while attending a patient in a professional manner. The physician-patient privilege includes medical records, *Leritz v. Koehr*, 844 S.W.2d 583, 584 (Mo.App.1993), and it applies to psychiatrists. *Griggs v. Griggs*, 707 S.W.2d 488, 490 (Mo.App.1986). The policy supporting the statute is·"to protect the patient by allowing him to make full disclosure without fear that the information will be used against him." *Leritz*, 844 S.W.2d at 584.

■■■■ The physician-patient privilege belongs to the patient, and only he can waive it. *McClelland v. Ozenberger*, 805 S.W.2d 264, 267 (Mo.App.1991). The privilege may be waived in numerous ways. Once a party places the matter of his physical or mental condition in issue under the pleadings, the party waives the privilege with respect to any information bearing on the issue. *Brandt v. Medical Defense Associates*, 856 S.W.2d 667, 671 (Mo.banc 1993); *Husgen v. Stussie*, 617 S.W.2d 414, 416 (Mo.App.1981). Furthermore, a party can impliedly waive the privilege through an act showing a clear, unequivocal purpose to divulge the confidential information. *State ex rel. Gonzenbach v. Eberwein*, 655 S.W.2d 794, 796 (Mo.App. 1983).

■■■ It is beyond question that plaintiff initially waived her physician-patient privilege by placing her mental condition in issue in an attempt to recover for "mental anguish." Consistent with this position, plaintiff disclosed the confidential information by permitting defendant to review Brookes' records and depose him. The only issue that remains is whether plaintiff can revoke her waiver of the privilege.

The Missouri Supreme Court has squarely addressed this issue, declaring that: "the medical privilege only covers matters that are confidential. Once there is a disclosure of the information in any form, it is no longer confidential and therefore no longer privileged." *Brandt*, 856 S.W.2d at 672. Plaintiff clearly waived the privilege and invited defendant to act upon that waiver prior to her revocation of the waiver. The trial court, therefore, erred in prohibiting defendant from deposing Brookes and from entering his records and testimony into evidence.

## IV. Improper Cross-Examination

In its fourth point, defendant contends the trial court erred in permitting plaintiff to cross-examine Dr. Friedman concerning a letter he wrote to a newspaper about a "turf dispute" between plastic surgeons and otolaryngologists and whether he ever participated in defrauding medical insurance companies. Defendant argues the questions were irrelevant, inflammatory and prejudicial.

During cross-examination, plaintiff asked Dr. Friedman questions pertaining to articles in the St. Louis Post–Dispatch concerning who should perform plastic surgery. Plastic surgeons had written articles arguing that

they should be the only surgeons to perform such procedures. Dr. Friedman, an otolaryngologist who performs facial plastic surgery, wrote an article rebutting the plastic surgeons' position. Plaintiff also asked the doctor whether he ever told a patient that medical insurance would cover a surgical procedure which medical insurance in fact did not cover and whether he had ever altered an insurance claim submission to qualify the particular surgical procedure for insurance coverage.

Plaintiff argues the questions concerning the newspaper articles were relevant to exploring Dr. Friedman's credentials and qualifications to perform plastic surgery. Plaintiff further maintains the questions concerning whether the doctor defrauded medical insurance companies were relevant to impeach his credibility because he had testified on direct examination about discounts he extended for surgical procedures to certain individuals.

■■■ The trial court is accorded a wide amount of discretion in determining the scope and extent of cross-examination. We will not disturb the trial court's ruling on this matter absent a clear showing of an abuse of discretion. *Callahan v. Cardinal Glennon Hospital*, 863 S.W.2d 852, 868–69 (Mo. banc 1993).

While there is no hard and fast rule regarding the appropriate extent and scope of cross-examination, "any pertinent inquiry having some reasonable relation or bearing on the issues in the case or tending to impeach or discredit the witness is generally proper." *Parker v. Pine*, 617 S.W.2d 536, 542 (Mo.App.1981). However, cross-examination should not be an outlet for "merely bringing in irrelevant matters purposely calculated to prejudice the minds of the jury . . . especially if the effect would be to prejudice the minds of the jury." *Wills v. Townes Cadillac–Oldsmobile, Inc.*, 490 S.W.2d 257, 263 (Mo.1973).

■■■ Plaintiff has failed to show that the cross-examination questions in dispute bear any reasonable relation to any issues in the case. The newspaper articles simply concerned a public debate about who should perform plastic surgery. While this may be a compelling topic within the medical community or the general public, it in no way discredits Dr. Friedman or calls into question his ability and qualifications to perform blepharoplasty. The questions concerning the articles brought before the jury a false issue far removed from the issues in the case. Moreover, the questions concerning whether Dr. Friedman had ever defrauded insurance companies not only injected a false issue into the case but also prejudiced the minds of the jury. The questions created the impression that Dr. Friedman participated in an insurance scam, a matter wholly unrelated to any issue in the case.

We conclude that the trial court erred in permitting plaintiff to cross-examine Dr. Friedman concerning the newspaper articles and insurance scam. The questions injected false issues into the case and improperly prejudiced the minds of the jury.

## V. Verdict–Director Instruction

In its fifth point, defendant contends the trial court erred in giving Instruction No. 6, the verdict-directing instruction. Defendant argues that Dr. Friedman's negligence was assumed in the tail of the instruction.

Instruction No. 6 reads:

Your verdict must be for Plaintiff if you believe:

First, Defendant's agent, William H. Friedman, when performing eyelid surgery on Plaintiff failed to leave adequate skin to allow for complete eyelid closure, and

Second, Defendant's agent William H. Friedman was thereby negligent, and

Third, as a direct result of such negligence Plaintiff sustained damage.

You must consider the fault of Dr. William H. Friedman as the fault of Defendant, William H. Friedman & Associates, Inc. d/b/a Park Central Institute.

■■■ The tail is taken from MAI 37.05(2), the approved instruction for submitting comparative fault in a vicarious liability situation where agency is not disputed. The purpose of the instruction is to advise the jury that the conduct of the agent serves as the basis for the determination of any possible per-

centage of fault to be assessed against the master. There is no need for such advice in a non-comparative fault negligent verdict director because the jury is instructed that a verdict for plaintiff (and against defendant master) must be returned if the agent was negligent as submitted. The addition of the tail to a plain negligence verdict director is argumentative.

Moreover, the form of the tail does not conform to MAI 37.05(2) from which it was drawn. The pattern instruction preserves the agent's possible fault as a disputed issue by referring to "any such percentage of fault." Here the instruction assumes as an undisputed fact that fault was attributable to Dr. Friedman. The error could have been alleviated if the trial court had acceded to the defendant's request to insert the words "if any" after the word "fault," but the court denied this request.

■ A verdict-directing instruction must require the jury to find all the necessary elements of plaintiff's case, except for uncontroverted facts. It is reversible error for an instruction to assume or ignore a controverted fact. *Young v. Kansas City Power and Light Co.*, 773 S.W.2d 120, 125 (Mo.App. 1989); *Flo–Products Co. v. Valley Farms Dairy Co.*, 718 S.W.2d 207, 208 (Mo.App. 1986).

■ The verdict-directing instruction assumed Dr. Friedman's negligence as a fact. There is no doubt that this was a controverted factual issue in the case. Accordingly, the trial court erred in giving Instruction No. 6 to the jury.

Additional points asserted by defendant on appeal need not be addressed. For the reasons set forth, the judgment of the trial court is reversed, and the cause is remanded for a new trial.

GRIMM, P.J., and AHRENS, J., concur.